[No. 56377-2. En Banc. November 20, 1992.]

FIRST COVENANT CHURCH OF SEATTLE, *Appellant*, v. THE
CITY OF SEATTLE, *Respondent*.

206

*A.T. Wendells* and *Clinton, Fleck, Glein, DeSmet & Thomson, P.S.,* by *Gordon S. Clinton,* for appellant.

*Mark H. Sidran, City Attorney,* and *Robert D. Tobin, Assistant,* for respondent.

*Steven T. McFarland, David C. Hammermaster, Angela C. Carmella,* and *Carl H. Esbeck* on behalf of Christian Legal Society; Church Council of Greater Seattle; The Corporation of the Catholic Archbishop of Seattle; Washington State Catholic Conference; Diocese of Olympia, The Episcopal Church in Western Washington; North Pacific Conference of Covenant Churches; Evangelical Covenant Church; James E. Andrews as Stated Clerk of the General Assembly of the Presbyterian Church (U.S.A.); Baptist Joint Committee on Public Affairs; Evangelical Lutheran Church in America; General Conference of Seventh-Day Adventists; Council on Religious Freedom; Americans United for Separation of Church and State; National Association of Evangelicals; and National Council of the Churches of Christ in the U.S.A., amici curiae for appellant.

*William E. Hegarty* and *Stephen J. Kennedy* on behalf of the Municipal Art Society of New York, amicus curiae for respondent.

*David A. Doheny, Andrea C. Ferster, Elizabeth S. Merritt, Frank Williamson, Stephen J. Kennedy,* and *Jerold S. Kayden* on behalf of National Trust for Historic Preservation in the United States and Washington Trust for Historic Preservation, amici curiae for respondent.

DORE, C.J. — We reinstate our holding in *First Covenant Church v. Seattle*[1] that applying the City's ordinances to the church violates the free exercise guaranties of the First Amendment to the federal constitution and article 1, section 11 of the state constitution. We have fully considered the Supreme Court's holding in *Employment Div., Dep't of Human Resources v. Smith,*[2] and we conclude that *Smith* is distinguishable from this case and does not compel a different result.

## ISSUE

Whether applying Seattle's Landmarks Preservation Ordinance to First Covenant violated the church's right to free exercise under the state and the federal constitutions?

## FACTS

First Covenant owns the church located at Pike and Bellevue Streets in Seattle. First Covenant uses its church exclusively for religious purposes.

The City of Seattle adopted the Landmarks Preservation Ordinance[3] to:

> designate, preserve, [and] protect, . . . improvements and objects which reflect significant elements of the City's cultural, aesthetic, social, economic, political, architectural, engineering, historic or other heritage . . .[.]

Seattle Municipal Code (SMC) 25.12.020(B) (1977); Clerk's Papers, at 6. Pursuant to that ordinance, the Landmarks Preservation Board nominated First Covenant's church as a landmark in October 1980. First Covenant objected to the nomination at public hearings, but the Board approved designation of the church as a landmark in January 1981. In April 1981, the Board adopted controls to preserve the exterior of the church.

---

[1]114 Wn.2d 392, 787 P.2d 1352 (1990), *cert. granted, judgment vacated and remanded,* 499 U.S. 901 (1991).

[2]494 U.S. 872, 108 L. Ed. 2d 876, 110 S. Ct. 1595 (1990).

[3]Now codified as Seattle Municipal Code 25.12.

The church and City unsuccessfully negotiated about the controls that the City would impose on the church. The parties appeared before a hearing examiner in June 1981. The church again objected to its designation as a landmark. The hearing examiner recommended that the city council approve the Board's proposed controls in July 1981.

On September 17, 1985, the city council adopted ordinance 112425, which designated First Covenant's church a landmark. The designation ordinance requires that First Covenant get a certificate of approval before it makes certain alterations to the church's exterior. It also provides that:

> [N]othing herein shall prevent any alteration of the exterior when such alterations are necessitated by changes in liturgy, it being understood that the owner is the exclusive authority on liturgy and is the decisive party in determining what architectural changes are appropriate to the liturgy. When alterations necessitated by changes in liturgy are proposed, the owner shall advise the Landmarks Preservation Board in writing of the nature of the proposed alterations and the Board shall issue a Certificate of Approval. Prior to the issuance of any Certificate, however, the Board and owner shall jointly explore such possible alternative design solutions as may be appropriate or necessary to preserve the designated features of the landmark.

Clerk's Papers, at 174-75.

First Covenant filed a declaratory judgment action in January 1986. It sought a judgment that the "religious freedom provisions" of the state constitution prohibited application of the Landmarks Preservation Ordinance to active churches and that application of the Landmarks Preservation Ordinance to its church was void. Clerk's Papers, at 2-5.

First Covenant and the City both filed for summary judgment on the free exercise issues. The court granted the City's motion and dismissed First Covenant's free exercise claims as premature, without prejudice to First Covenant's other contentions. Clerk's Papers, at 104-07. Before trial, the City moved for, and the court granted, dismissal of First Covenant's other claims. A majority of this court concluded, in *First Covenant,* that First Covenant's claims that the Landmarks Preservation and designation ordinances violated the

free exercise of religion were not premature. *First Covenant Church v. Seattle, supra* at 398-400. A majority, for different reasons, also concluded that applying the City's ordinances to First Covenant burdened the church's right of free exercise of religion under the federal and state constitutions. *First Covenant Church v. Seattle, supra* at 405-06, 412. And the majority, again for different reasons, concluded that the liturgy exemption did not mitigate the burden on free exercise. *First Covenant Church v. Seattle, supra* at 407, 412.

The majority applied the strict scrutiny analysis of *Sherbert v. Verner,* 374 U.S. 398, 10 L. Ed. 2d 965, 83 S. Ct. 1790 (1963), when assessing the free exercise claim. It concluded that landmark preservation was not a "compelling interest" that justified the burden on First Covenant's right to free exercise and, therefore, that applying the City's ordinances to First Covenant violated First Covenant's free exercise rights under the state and federal constitutions. *First Covenant Church v. Seattle, supra* at 408.

The City appealed. The United States Supreme Court vacated the judgment and remanded it to us for "further consideration in light of *Employment Division, Department of Human Resources of Oregon v. Smith . . .*".[4] The Christian Legal Society (CLS), as amicus curiae, supports First Covenant. The Municipal Art Society of New York and the National Trust for Historic Preservation in the United States filed briefs supporting the City of Seattle.

ANALYSIS

The Supreme Court remanded *First Covenant* to this court, for "further consideration in light of" *Employment Div., Dep't of Human Resources v. Smith, supra.* In *Smith,* two drug rehabilitation counselors were fired from their jobs because they ingested peyote as part of a religious ceremony. The counselors applied for unemployment compensation. The Department denied their applications because it concluded that the counselors were discharged for "work-related" mis-

---

[4] 499 U.S. 901 (1991).

conduct and, therefore, ineligible under Oregon's compensation statute.

The Oregon Supreme Court, in *Employment Div., Dep't of Human Resources v. Smith,*[5] concluded that denying the counselors compensation violated their First Amendment right to free exercise. The United States Supreme Court vacated the decision and remanded *Smith* I, so that the state court could determine whether Oregon law proscribed sectarian use of peyote. On remand, the Oregon court concluded that the criminal statute proscribed religiously inspired use of peyote; the statute was not valid; and that denying benefits based on conduct proscribed by the invalid statute violated the counselors' First Amendment rights. The Supreme Court granted certiorari.

█ The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . .." The First Amendment absolutely prohibits the regulation of beliefs "as such" and the government may not compel or punish the expression of religious belief. *Employment Div., Dep't of Human Resources v. Smith,* 494 U.S. 872, 876-77, 108 L. Ed. 2d 876, 884, 110 S. Ct. 1595 (1990) (*Smith* II). Justice Scalia presumes that the First Amendment prohibits a law that bans conduct only when the conduct is engaged in for religious purposes or because of the religious belief it displays. *Smith* II, at 876-77.

█ The Court warns that religious motivation does not place conduct "beyond the reach of a criminal law that is not specifically directed at [the] religious practice". *Smith* II, at 878. Justice Scalia compares the application of criminal laws to religiously motivated conduct with the application of general tax laws to persons who believe organized government sinful. He concludes that in both cases "if prohibiting the exercise of religion . . . is not the object of the [provision,] but merely the incidental effect of a generally applicable and

---

[5]485 U.S. 660, 99 L. Ed. 2d 753, 108 S. Ct. 1444 (1988) (*Smith* I).

otherwise valid provision, the First Amendment has not been offended." *Smith* II, at 878. Justice Scalia concludes that "free exercise" does not relieve an individual of the obligation to comply with a "neutral law of general applicability on the ground that the law proscribes . . . conduct that his religion prescribes . . .". *Smith* II, at 879.

Justice Scalia suggests that the First Amendment does not bar application of a neutral, generally applicable law to religiously motivated conduct unless the conduct involves "[T]he Free Exercise Clause in conjunction with other constitutional protections", such as freedom of speech, the press, or the right of parents to educate their children. *Smith* II, at 881. The *Smith* II case does not present a "hybrid situation", in which the free exercise claim is "connected to" a communicative activity or parental right. The Court, therefore, concludes that applying Oregon's criminal law to the counselors does not violate the First Amendment. *Smith* II, at 882.

The Court next considers whether it must evaluate the claim for exemption from Oregon's criminal law under the "compelling interest" test set forth in *Sherbert v. Verner*.[6] Justice Scalia notes that the Court, applying the *Sherbert* test, invalidated unemployment compensation regulations in three cases, but that when it applied the test in cases not involving unemployment compensation it upheld the challenged conduct. *Smith* II, at 883. Justice Scalia states that the *Sherbert* test does not require an exemption "from a generally applicable criminal law." *Smith* II, at 884. He contrasts an "across-the-board criminal prohibition" of conduct with a statutory system, like the unemployment compensation scheme, that "len[ds] itself to individualized . . . assessment of the reasons for . . . conduct", creates a "mechanism for individualized exemptions", and contains individual exemptions. *Smith* II, at 884. Justice Scalia warns that if the

---

[6] 374 U.S. 398, 403, 10 L. Ed. 2d 956, 83 S. Ct. 1790, 1793 (1963) states that "[A]ny incidental burden on the free exercise of appellant's religion may be justified by a 'compelling state interest in a regulation of a subject within the State's constitutional power to regulate . . ..'"

State has in place a system of individual exemptions, it may not refuse to extend that system to cases of religious hardship without compelling reason. *Smith* II, at 884. He notes that the Court has not invalidated a criminal prohibition under the *Sherbert* test and concludes that the *Sherbert* test does not apply to free exercise challenges to across-the-board criminal prohibitions. *Smith* II, at 884-85.

Justice Scalia opines that applying the *Sherbert* test broadly will "court anarchy" because "people of almost every conceivable religious preference" could demand exemptions from "civic obligations of almost every conceivable kind" based on their right to freely exercise religion. *Smith* II, at 888. Justice Scalia concludes "we cannot afford the luxury of deeming *presumptively invalid*, . . . every regulation of conduct that does not protect an interest of the highest order." *Smith* II, at 888. He considers it the role of the state legislatures to create free exercise exemptions to drug laws, even if this approach places at a disadvantage minority religions. *Smith* II, at 890.

Language in the *Smith* I and *Smith* II opinions suggests that the *Smith* II rule applies only to free exercise challenges to criminal prohibitions. Other federal and state courts, however, have specifically rejected this argument and concluded that the *Smith* II holding is not limited to criminal cases.[7] The rule of *Smith* II applies in both civil and criminal cases and may apply in this case if the City's preservation ordinances are neutral and generally applicable.

---

[7]*Rector, Wardens, & Members of Vestry of St. Bartholomew's Church v. New York*, 914 F.2d 348, 354 (2d Cir. 1990) (Second Circuit applies *Smith* II reasoning to a free exercise challenge to landmarks preservation ordinance), *cert. denied*, 499 U.S. 905 (1991); *Salvation Army v. Department of Comm'ty Affairs*, 919 F.2d 183, 194-96 (3d Cir. 1990) (Third Circuit applies *Smith* II in a free exercise/ zoning case); *Vandiver v. Hardin Cy. Bd. of Educ.*, 925 F.2d 927, 932 (6th Cir. 1991) (Sixth Circuit applies *Smith* II rule when parents allege Kentucky's equivalency exams law violates free exercise); *Health Servs. Div., Health & Env't Dep't v. Temple Baptist Church*, 112 N.M. 262, 814 P.2d 130 (Ct. App.) (New Mexico court applies *Smith* II when church contends day-care license law violates free exercise), *cert. denied*, 112 N.M. 235 (1991); *Black v. Snyder*, 471 N.W.2d 715 (Minn. Ct. App. 1991) (*Smith* II standard applies to civil claims, including breach of contract, defamation, and harassment).

*Smith* II states that the "right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability . . ..' " *Smith* II, at 879. First Covenant and the CLS contend that the City's Landmarks Preservation Ordinance is not neutral or generally applicable because the sites, improvements, and objects they govern are arbitrarily selected, and the selection process requires individual evaluation of each building, site, or improvement.

The Landmarks Preservation Ordinance, SMC 25.12, was passed in 1977. The designation ordinance, 112425, was passed pursuant to the general ordinance and "is simply the means by which the Landmarks Ordinance is implemented." Reply Brief of Respondent on Remand, at 30. Thus, although it was enacted after SMC 25.12, we consider it part of the general act.

■ The designation criteria of SMC 25.12 are neutral. They apply to "[a]n object, site or improvement which is more than twenty-five (25) years old" and meets the designation criteria. SMC 25.12.350. The definitions of "object" and "improvement" are also facially neutral. SMC 25.12.190, .140. *See Rector, Wardens, & Members of Vestry of St. Bartholomew's Church v. New York*, 914 F.2d 348, 354 (2d Cir. 1990), *cert. denied*, 499 U.S. 905 (1991). Designation ordinance 112425, however, is not neutral. It alludes to religious facilities in the two references to "liturgy". Because the Landmarks Preservation Ordinances specifically refer to religious facilities, they are not "neutral". *See Health Servs. Div., Health & Env't Dep't v. Temple Baptist Church*, 112 N.M. 262, 266, 814 P.2d 130, 134 (Ct. App.), *cert. denied*, 112 N.M. 235 (1991).

■ The landmarks ordinances must also be "generally applicable" laws. Justice Scalia contrasted "generally applicable" tax laws with statutes that contain "a system of individualized exceptions", that "create[] a mechanism for individualized exemptions" or that lend themselves to "individualized governmental assessment" of the conduct governed. *Smith* II, at 884. *Cf. Jimmy Swaggart Ministries v.*

*Board of Equalization*, 493 U.S. 378, 107 L. Ed. 2d 796, 110 S. Ct. 688, 696 (1990). The landmarks ordinances at issue here are unlike a general tax law because they invite individualized assessments of the subject property and the owner's use of such property, and contain mechanisms for individualized exceptions. Ordinance 106348 §§ 3.01, 6.01, 8.01, 9.05; SMC 25.12.350, .420, .490-.500, .570-.600. The City's Landmarks Preservation Ordinance is not generally applicable. Compare *American Friends Serv. Comm'ty Corp. v. Thornburgh*, 941 F.2d 808, 811 (9th Cir. 1991).

The City and the National Trust for Historic Preservation in the United States (National Trust) insist that *Rector, Wardens, & Members of Vestry of St. Bartholomew's Church v. New York*,[8] compels a different result. St. Bartholomew's owned a church and a community house. Both buildings were designated landmarks in 1967, pursuant to New York's Landmark Law. The law provides a detailed hearings and appeals process for those who object to designation and exempts from designation "interiors utilized as places of religious worship". N.Y. Admin. Code, ch. 3, tit. 25, § 25-303(a)(2) (1992).

In 1983, St. Bartholomew's asked for a certificate of appropriateness to replace the community house with a 47-story tower, some of which it would use, the rest of which it would rent as commercial property. The New York City Landmarks Preservation Commission denied approval. The church alleged that the landmark law violated its right to free exercise and was not neutral or generally applicable because it vested discretion in the Commission. The court concluded that the landmark law did not "demonstrate a lack of neutrality or general applicability" and that, absent proof that the Commission exercised its discretion in a discriminatory way, "there [was] no constitutional relevance" to the church's claim. *St. Bartholomew's Church*, at 354-55.

*St. Bartholomew's* is distinguishable from this case. St. Bartholomew's accepted designation as a landmark, without

---

[8]*Supra.*

objection. First Covenant has objected continuously to designation. St. Bartholomew's sought an exception for an adjunct building, not its church building. First Covenant seeks an exception for its church building. St. Bartholomew's sought an exception to use its property for commercial purposes. First Covenant seeks an exemption so that it may continue to use its church for exclusively religious purposes. St. Bartholomew's did not allege that designation reduced its principal asset, only that it impeded its ability to generate additional revenue to expand its programs. Uncontroverted evidence supports First Covenant's claim that designation reduces the value of its principal asset by almost one-half. Finally, the parties in *St. Bartholomew's* did not challenge the effect of the religious exemption on the New York law's constitutionality, and the religious exemption in the New York law is not "liturgy" based, as is Seattle's. *St. Bartholomew's* is factually distinguishable and does not control this case.

The rule in *Smith* II also does not apply because First Covenant's claim presents a "hybrid situation". The cases upon which the Supreme Court relied when it formulated the "hybrid claim" exception, as well as other authority, support the view that a "hybrid" case is one in which a single claim encompasses several protected interests.[9] The church's claim is "hybrid" because designation not only violates First Covenant's right to freely exercise religion, it infringes on First Covenant's rights to free speech.

■ "Speech" includes nonverbal conduct if the conduct is "sufficiently imbued with elements of communication". *Spence v. Washington*, 418 U.S. 405, 409, 41 L. Ed. 2d 842, 94 S. Ct. 2727, 2730 (1974). Whether conduct constitutes speech depends on the nature of the activity, combined with the factual context and environment in which the activity is undertaken. *Spence v. Washington, supra.* There must be

---

[9]See cases collected in *Smith* II, 494 U.S. at 881-82. *See also American Friends Serv. Comm'ty Corp.*, 941 F.2d at 810-11; *Health Servs. Div., Health & Env't Dep't v. Temple Baptist Church, supra* at 265-66; *State v. Hershberger*, 462 N.W.2d 393, 396 (Minn. 1990).

" '[an] intent to convey a particularized message" and a great "likelihood . . . that the message would be understood by those who view it' ". *Texas v. Johnson*, 491 U.S. 397, 404, 105 L. Ed. 2d 342, 109 S. Ct. 2533, 2539 (1989).

 First Covenant claims, and no one disputes, that its church building itself "is an expression of Christian belief and message" and that conveying religious beliefs is part of the building's function. First Covenant reasons that when the State controls the architectural "proclamation" of religious belief inherent in its church's exterior it effectively burdens religious speech. We agree with First Covenant's reasoning. The relationship between theological doctrine and architectural design is well recognized. Pak, *Free Exercise, Free Expression, and Landmarks Preservation*, 91 Colum. L. Rev. 1813, 1840-43 (1991); Carmella, *Houses of Worship and Religious Liberty: Constitutional Limits to Landmark Preservation and Architectural Review*, 36 Vill. L. Rev. 401, 490-98 (1991); Crewdson, *Ministry and Mortar: Historic Preservation and the First Amendment After* Barwick, 33 J. Urb. & Contemp. L. 137, 157-58 (1988). The exterior and the interior of the structure are inextricably related. When, as in this case, both are "freighted with religious meaning" that would be understood by those who view it, then the regulation of the church's exterior impermissibly infringes on the religious organization's right to free exercise and free speech. Crewdson, *supra*; *see Society of Jesus v. Boston Landmarks Comm'n*, 409 Mass. 38, 42, 564 N.E.2d 571, 573 (1990); *cf. Murdock v. Commonwealth*, 319 U.S. 105, 87 L. Ed. 1292, 63 S. Ct. 870, 146 A.L.R. 81 (1943); *West Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 87 L. Ed. 1628, 63 S. Ct. 1178, 147 A.L.R. 674 (1943); *Follett v. McCormick*, 321 U.S. 573, 88 L. Ed. 938, 64 S. Ct. 717, 152 A.L.R. 317 (1944).

In summary, we agree with Justice O'Connor, who opined in *Smith* II that "drug abuse is 'one of the greatest problems affecting the health and welfare of our population' and thus 'one of the most serious problems confronting our society today.' " *Smith* II, 494 U.S. at 904. But First Covenant's case is

distinguishable from *Smith* II because *Smith* II is a police power case and this case is not. The less protective free exercise standard set forth in *Smith* II, therefore, does not apply to First Covenant's claim. The City's preservation ordinances, unlike the statutes in *Smith* II, are not neutral and generally applicable. Further, *Smith* II does not apply because the case presents a "hybrid situation": First Covenant's claim involves the free exercise clause in conjunction with free speech. The *Sherbert* Court's "compelling interest" test, therefore, applies to the justiciable controversy before us.

Applying the *Sherbert* "compelling interest" test, we address the church's contention that subjecting it to the controls of the Landmarks Preservation Ordinance burdens its right to freely exercise religion. The First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. The First Amendment applies to the states through the Fourteenth Amendment. *Hobbie v. Unemployment Appeals Comm'n,* 480 U.S. 136, 139-40, 94 L. Ed. 2d 190, 107 S. Ct. 1046, 1048 (1987). The First Amendment absolutely protects the freedom to believe, but conduct, even when religiously motivated, is not totally free of government regulation. *Sherbert,* at 402.

■ Government regulation is constitutional either if it does not infringe constitutional rights of free exercise, or if any burden on free exercise, direct or indirect, is justified by a compelling state interest in the regulation of subject matter within the State's power to regulate. *Sherbert,* at 1793-94. The party who alleges that state action restrains his free exercise of religion must "show the coercive effect of the enactment as it operates against him in the practice of his religion." *School Dist. v. Schempp,* 374 U.S. 203, 223, 10 L. Ed. 2d 844, 83 S. Ct. 1560 (1963). If a party establishes such an infringement on his right to free exercise, the Court will subject the infringement to strict scrutiny. *Hobbie,* at 141. The State then must establish that some compelling state interest justifies the infringement and that the enactment is the least restrictive means to achieve the State's end. *Sherbert,* at 406-09.

■ The City's ordinances, as this court held earlier, impermissibly burden First Covenant's right to free exercise in two ways. The ordinances burden free exercise "administratively" because they require that First Covenant seek the approval of a government body before it alters the exterior of its house of worship, whether or not the alteration is for a religious reason. *Cf. Church of St. Paul & St. Andrew v. Barwick*, 67 N.Y.2d 510, 527, 537-38, 496 N.E.2d 183, 194, 200-01, *cert. denied*, 479 U.S. 985 (1986). Further, they burden First Covenant financially, because they reduce the value of the church's property by almost half.[10]

■ The City alleges that financial burdens do not violate the First Amendment, under *Jimmy Swaggart Ministries v. Board of Equalization*, 493 U.S. 378, 107 L. Ed. 2d 796, 110 S. Ct. 688 (1990). The City is mistaken: *Swaggart* does not control this case. *Swaggart* held that imposition of California's sales and use tax on the in-state sales of Jimmy Swaggart Ministries did not violate the free exercise clause because the sales tax was not a "precondition to the exercise of evangelistic activity" and was more "akin to a generally applicable income or property tax". *Swaggart*, at 389-90. The Court warned, however, "a more onerous tax rate, even if generally applicable" might violate the constitution if it too severely impeded religious activity. *Swaggart*, at 391.

After *Swaggart*, the State may impose on religious activity a neutral, generally applicable tax that does not act as a prior restraint on religious conduct. *Swaggart*; *Hope Evangelical Lutheran Church v. Iowa Dep't of Rev. & Fin.*, 463 N.W.2d 76, 80-81 (Iowa 1990). It is clear, however, that a financial burden on religious activity, if too gross, may unconstitutionally infringe on free exercise. *Hope Evangelical Lutheran Church*

---

[10]The City, for the first time, disputes the amount of depreciation First Covenant suffered because of designation. The City did not dispute the depreciation at trial or previously on appeal; it relied on the reported depreciation in one of its arguments on appeal (Brief of Respondent, at 12-13, 40); and it still does not present evidence that controverts the evaluation of First Covenant's expert. Construing the evidence in the light most favorable to the nonmoving party we accept the depreciation that the church reported. *LaMon v. Butler*, 112 Wn.2d 193, 197, 770 P.2d 1027, *cert. denied*, 493 U.S. 814 (1989).

*v. Iowa Dep't of Rev. & Fin., supra; Murdock*, at 111-12 ("It is plain that a religious organization needs funds to remain a going concern." Those who can tax religious practice can make the exercise of religion impossible to maintain.); *Follett*, at 576 ("Freedom of religion is not merely reserved for those with a long purse"); *Sumner v. First Baptist Church*, 97 Wn.2d 1, 7, 639 P.2d 1358 (1982) (enforcement of code violates First Amendment because "practical [financial] effect of . . . enforcement would be to close down the church-operated school"). *See also Lutheran Church in Am. v. New York*, 35 N.Y.2d 121, 129, 316 N.E.2d 305, 311 (1974) (landmark designation that deprives church of reasonable use of land violates Fifth Amendment). Designation of First Covenant's church so grossly diminishes the value of the Church's principal asset that it impermissibly burdens First Covenant's right to free exercise of religion.

The City urges that the "liturgy exemption" alleviates any burden on the exercise of religion. We do not believe that the exemption cures either the "administrative" or the financial infringements of First Covenant's right to free exercise.

First, the plain and ordinary meaning of the term "liturgy", which we employ absent a statutory definition of that term,[11] does not provide a workable standard that protects the constitutional rights of the church. "Liturgy" is a "rite or series of rites, observances, or procedures prescribed for public worship in the Christian church in accordance with authorized or standard form." *Webster's Third New International Dictionary* 1323 (1971). "Liturgy" essentially refers to prescribed conduct that occurs within the structure. The liturgy-focused exemption in this case is constitutionally infirm because it allows the City to control any nonliturgical elements of religious conduct that require architectural change. Carmella, at 475, 507-08. Further, as we previously observed:

> Would a wider door to permit access by handicapped parishioners comprise a liturgical change? Although . . . widening the

---

[11]*State v. Smith*, 117 Wn.2d 263, 271, 814 P.2d 652 (1991).

door does not relate directly to the rites or procedures of worship in the church, it does facilitate the ability of disabled persons to participate in religious services and activities. The anomalies created by the liturgy exception are cumbersome and would result in . . . delays in carrying out routine church work.

*First Covenant*, 114 Wn.2d at 407.

Secondly, adopting the City's interpretation of the phrase "necessitated by changes in liturgy" as meaning "for religious purposes" does not resolve the ambiguity. *First Covenant*, at 406. The City still has the right to determine what is or what is not for a religious purpose and it acknowledged at argument that it reserved the right to determine if the "religious purpose" claim was "bona fide". Before this court, the City stated:

> TOBIN: The City of Seattle has no interest in restricting the religious freedom . . . of the church . . .
> DOLLIVER: Even if you had an interest . . . you have just simply stipulated that away.
> TOBIN: That's true.
> DORE: That's not entirely true because . . . You have the right under the language of this [ordinance] . . . to make [the church] consult their architects to try to work out a mutually acceptable proposal. [What the church wants] it's not absolute . . . because if you don't like it you have a right to go . . . if you can't get together on it then do you automatically grant it or do you hold firm?
> TOBIN: . . . I think the ordinance requires the City to grant that kind of approval. Now, if the City objected to that for some reason, . . . I think we're required to issue the certificate of approval for demolition, and if the City thought that was not bona fide in some sense, that the church's argument that it was . . . needed for religious purposes was not bona fide, I suppose it would have the option of going into court . . . and [asking] the court to make that kind of decision.

Tape of oral argument before Supreme Court (Oct. 11, 1989). From Mr. Tobin's statement, it is clear that the City reserves the right to oversee and challenge First Covenant's decisions about what is liturgy and what is a valid religious purpose. Further, the City's suggestion that if it did not believe First Covenant's interpretation of liturgy was bona fide it would bring the church and the religious question before the courts fosters exactly the kind of religious entanglement the consti-

tution seeks to avoid. The governmental oversight of church action that the City reserves to itself, under the liturgy exception, impermissibly burdens free exercise.

Ordinance 112425 also requires that First Covenant seek the City's approval before it alters its church, even for presumptively valid "liturgical" purposes. The exemption states that if the church proposes an alteration "necessitated by changes in liturgy", "the Board and owner shall jointly explore such possible alternative design solutions as may be appropriate or necessary to preserve the designated features of the landmark." The requirement that the church negotiate with the City constitutes unjustified governmental interference in religious matters and infringes First Covenant's right to free exercise.

Finally, the liturgy exemption does not mitigate the financial burden that designation imposes on First Covenant. Regardless of how the exemption is construed, the church suffers the same dramatic depreciation in the value of its property and principal asset. In sum, the liturgy exemption does not cure the infringement of free exercise by the Landmarks Preservation Ordinance.

If government action burdens the exercise of religion, but the State demonstrates that it has a compelling interest in enforcing its enactment, that interest will justify the infringement of First Amendment rights. *Sherbert*, at 406-07. The State, through its police power, may regulate the use of land. *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 125, 57 L. Ed. 2d 631, 98 S. Ct. 2646 (1978). Landmark preservation laws enacted pursuant to legislative authority regulate land use by conserving structures with historic or aesthetic significance that enhance the quality of life of all citizens. *Penn Cent. Transp. Co. v. New York City, supra* at 108; Carmella, at 428-30. Preservation ordinances further cultural and aesthetic interests, but they do not protect public health or safety. *Society of Jesus*, 409 Mass. at 43-44; *Church of St. Paul & St. Andrew v. Barwick*, 67 N.Y.2d 510, 539, 496 N.E.2d 183, 202 (Meyer, J., dissenting), *cert. denied,*

479 U.S. 985 (1986). We hold that the City's interest in preservation of aesthetic and historic structures is not compelling and it does not justify the infringement of First Covenant's right to freely exercise religion. The possible loss of significant architectural elements is a price we must accept to guarantee the paramount right of religious freedom.

Upon further consideration, in light of *Smith* II, we conclude that applying the City's preservation ordinances to First Covenant's church violates the church's right to freely exercise religion under the First Amendment.

Although we might distinguish this case from *Smith* II, and base our decision solely on federal grounds, we decline to do so. Like the *State v. Hershberger*, 462 N.W.2d 393 (Minn. 1990) court, we eschew the "uncertainty" of *Smith* II and rest our decision also on independent grounds under the Washington Constitution. *See Hershberger*, at 396.

Washington, like all the states, may provide greater protection for individual rights, based on its " 'sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution.' " *State v. Gunwall*, 106 Wn.2d 54, 59, 720 P.2d 808, 76 A.L.R.4th 517 (1986). Six nonexclusive factors, set forth in *State v. Gunwall, supra*, are relevant in determining whether the Washington State Constitution extends broader rights to citizens than the federal constitution:

1. The textual language of the state constitution;
2. Significant differences in the texts of parallel provisions of the federal and state constitutions;
3. State constitutional and common-law history;
4. Preexisting bodies of state law, including statutory law;
5. Differences in structure between the federal and the state constitutions; and
6. Matters of particular state interest or local concern.

*Gunwall*, at 61-62. The criteria suggest to counsel where briefing might appropriately be directed and helps insure that, if this court uses independent state constitutional grounds, it considers these criteria. *State v. Gunwall, supra*

at 61-62. If a party does not provide constitutional analysis based upon the factors set out in *Gunwall*, the court will not analyze the state constitutional grounds in a case. *Clark v. Pacificorp*, 116 Wn.2d 804, 829, 809 P.2d 176 (1991). First Covenant cites *Gunwall*, and its argument is complete enough that we will address the state free exercise claim.

Article 1, section 11, of the Washington State Constitution provides that:

> Absolute freedom of conscience in all matters of religious sentiment, belief, and worship, shall be guaranteed to every individual, and no one shall be molested or disturbed in person or property on account of religion; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace and safety of the state.

The first amendment to the United States Constitution provides in part:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . .[.]

The text of the state constitution focuses both on belief and on conduct, as evidenced in the terms "worship", "acts", and "practices". Article 1 clearly protects both belief and conduct.

The language of our state constitution is significantly different and stronger than the federal constitution. The First Amendment limits government action that "prohibits" free exercise. Our state provision "absolutely" protects freedom of worship and bars conduct that merely "disturbs" another on the basis of religion. Any action that is not licentious or inconsistent with the "peace and safety" of the state is "guaranteed" protection.

Our state constitutional and common law history support a broader reading of article 1, section 11 than of the First Amendment. Article 1, section 11, as adopted in 1889 and as amended in 1903, contained the same active, broad language noted above. Further, case law interpreting earlier versions of article 1 endorse a broad interpretation of the free exercise

provision. In *State ex rel. Holcomb v. Armstrong*,[12] the court stated that only a danger which was "clear and present, grave and immediate" justified an infringement on the plaintiff's freedom to exercise her religion. In *Bolling v. Superior Court*,[13] this court emphasized that freedom of religion was "vital", that it is "the most important dut[y] of our courts to ever guard . . . religious liberty, and to see to it that these guarantees are not narrowed or restricted because of some supposed emergent situation". Finally, in *Bolling* this court expressly disapproved the reasoning in *Minersville Sch. Dist. v. Gobitis*, 310 U.S. 586, 84 L. Ed. 1375, 60 S. Ct. 1010 (1940), reasoning upon which the Supreme Court based the *Smith* II free exercise test. *Bolling*, at 379-80, 382-85; *Smith* II, at 878-80.

The United States Constitution is a grant of limited power, authorizing the federal government to exercise only those constitutionally enumerated powers that the states expressly delegate to it. Our state constitution imposes limitations on the otherwise plenary power of the State to do anything not expressly forbidden by the state constitution or federal law. *Gunwall*, at 66, 67. This also supports construing article 1, section 11 more broadly, to protect free exercise.

Free exercise of religion is not a local concern. As noted above, however, our state exhibits a long history of extending strong protection to the free exercise of religion. *Cf. Gunwall*, at 67.

Finally, recalling that the *Gunwall* factors are not exclusive, resort to independent state law is appropriate because *Smith* II is "uncertain".[14] The majority's analysis in *Smith* II departs from a long history of established law and adopts

---

[12]39 Wn.2d 860, 864, 239 P.2d 545 (1952) (government's interest in protecting students and staff from disease outweighs student's right to refuse to have an x-ray).

[13]16 Wn.2d 373, 381, 385, 386, 133 P.2d 803 (1943) (flag salute ordinance cannot be enforced against Jehovah's Witnesses who believe salute violates biblical injunction).

[14]*State v. Hershberger*, 462 N.W.2d 393, 396 (Minn. 1990).

a test that places free exercise in a subordinate, instead of preferred, position. Further, one of the cases upon which the *Smith* II court principally relies, *Minersville Sch. Dist. v. Gobitis*, 310 U.S. 586, 84 L. Ed. 1375, 60 S. Ct. 1010 (1940), was overruled. *See West Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 87 L. Ed. 1628, 635 S. Ct. 1178, 147 A.L.R. 674 (1943); *Wooley v. Maynard*, 430 U.S. 705, 51 L. Ed. 2d 752, 97 S. Ct. 1428 (1977). Finally, the majority in *Smith* II accepts the fact that its rule places minority religions at a disadvantage. Our court, conversely, has rejected the idea that a political majority may control a minority's right of free exercise through the political process. *Bolling*, at 381, 383.

Analysis based on the *Gunwall* factors clearly demonstrates that resort to independent state grounds is warranted in this case.

▆ Article 1, section 11 of the state constitution absolutely protects "freedom of conscience in all matters of religious sentiment, belief, and worship" and guarantees that "no one shall be molested or disturbed in person or property on account of religion". This constitutional guaranty of free exercise is "of vital importance." *Bolling*, 16 Wn.2d at 381. If the "coercive effect of [an] enactment" operates against a party "in the practice of his religion", it unduly burdens the free exercise of religion. *Witters v. Comm'n for the Blind*, 112 Wn.2d 363, 371, 771 P.2d 1119, *cert. denied*, 493 U.S. 850 (1989); *Sumner*, 97 Wn.2d at 5. A facially neutral, even-handedly enforced statute that does not directly burden free exercise may, nonetheless, violate article 1, section 11, if it indirectly burdens the exercise of religion. *Sumner*, at 7-8; *Bolling*, at 385-86.

State action is constitutional under the free exercise clause of article 1 if the action results in no infringement of a citizen's right or if a compelling state interest justifies any burden on the free exercise of religion. *Witters*, at 371; *Sumner*, at 7-8; *cf. Holcomb*, 39 Wn.2d at 864. A "compelling interest" is one that has a "clear justification . . . in the necessities of

national or community life", *Bolling*, at 385 (quoting *Barnette v. West Va. State Bd. of Educ.*, 47 F. Supp. 251 (S.D.W. Va. 1942), *aff'd*, 319 U.S. 624, 87 L. Ed. 1628, 63 S. Ct. 1178, 147 A.L.R. 674 (1943)), that prevents a "clear and present, grave and immediate" danger to public health, peace, and welfare. *Sumner*, at 9; *Bolling*, at 385; *Holcomb*, at 864; *State v. Norman*, 61 Wn. App. 16, 23, 808 P.2d 1159 (1991). The State also must demonstrate that the means chosen to achieve its compelling interest are necessary and the least restrictive available. *Sumner*, at 8, 15 (Utter, J., concurring); *Holcomb*.

Seattle's ordinances, as discussed fully in our First Amendment analysis, impose unconstitutional administrative and financial burdens on First Covenant's free exercise of religion. The "liturgy exception" in the designation ordinance does not alleviate the harm. As detailed in our analysis of First Covenant's federal right to free exercise, the exemption standard is vague, the exemption still requires that the church seek secular approval before making religiously motivated changes to its facade, and the exemption does not alleviate the adverse financial impact of designation on First Covenant.

The City contends that this court, in *Sumner*, approved the kind of negotiations that the Landmarks Preservation Ordinance requires. The City is mistaken. *Sumner* recommended that a municipality make every effort to accommodate religious freedom, rather than uncompromisingly enforce its ordinances. *Sumner*, at 9-10. Recommending that a City remain sensitive to and accommodate religious interests is not the same as mandating that a church confer with the City before altering its house of worship for religious reasons.

Finally, a compelling state interest does not justify the impermissible burden. Application of the Landmarks Preservation Ordinance is not necessary to prevent a grave danger to the public health, peace, or welfare. *Holcomb*, at 864; *Bolling*, at 385; *Norman*, at 23. Interests, such as preservation of significant structures, are not "of sufficient magnitude to outweigh" the free exercise of religion. *Sumner*, at 9.

We conclude that imposing the City's Landmarks Preservation Ordinance on First Covenant's church violates First Covenant's right to free exercise of religion under article 1, section 11 of our state constitution.

The City contends that, under *Michigan v. Long*, 463 U.S. 1032, 77 L. Ed. 2d 1201, 103 S. Ct. 3469 (1983), when the Supreme Court granted certiorari it "necessarily determined" that designating the church did not violate First Covenant's right to free exercise under our state constitution. The City is mistaken. *First Covenant* is entirely distinguishable from *Long*.

When a case presents both state and federal questions, if the judgment rests on state grounds, the Supreme Court does not have jurisdiction to review the case. R. Stern, E. Gressman & S. Shapiro, *Supreme Court Practice* § 3.25 (6th ed. 1986). In *Michigan v. Long, supra* at 1040-41, the Court explained:

> [W]hen . . . a state court decision . . . appears to rest primarily on federal law, . . . and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so.

The "independent" and "adequate" requirements are separate and distinct. A state ground may be adequate but if it is not clear that it is independent of federal law grounds, the Supreme Court may accept jurisdiction. *Michigan v. Long, supra* at 1066; *New York v. Class*, 475 U.S. 106, 109-10, 89 L. Ed. 2d 81, 106 S. Ct. 960, 963-64 (1986). The purpose of the rule is to assure that "state courts be left free and unfettered . . . interpreting their state constitutions . . . [but] that ambiguous or obscure adjudications by state courts do not" bar the Court from determining whether state action violates the federal constitution. *Long*, at 1041.

In *Long*, the Court did not cite a single state case in support of its holding that state conduct was unconstitutional. In *First Covenant*, this court clearly stated that it was

adjudicating claims based on both the state and federal constitutions and we cited state and federal case law in support of our holding. Although it may not have been clear that the state grounds upon which we relied in *First Covenant* were independent of federal law, when the Supreme Court granted certiorari to clarify our adjudication it did not "necessarily decide" that designating First Covenant's church accords with article 1, section 11 of our state constitution.

CONCLUSION

1. Imposing the City's Landmarks Preservation Ordinance on First Covenant's church violates First Covenant's right to free exercise of religion under the First Amendment.

2. The Supreme Court's decision in *Smith* II does not compel a different result. *Smith* II considered the application of neutral, generally applicable criminal laws to religious conduct. Seattle's Landmarks Preservation Ordinances are not neutral or generally applicable. The First Amendment freedom of religion claim in *Smith* II did not include other protected rights, like freedom of speech. First Covenant's First Amendment claim joins both a protected interest in the free exercise of religion and in free speech. *Smith* II is distinguishable from this case.

3. *St. Bartholomew's* does not control our First Amendment analysis. St. Bartholomew's embraced designation as a landmark building without objection; did not seek an exception for its house of worship, but an adjacent building; did not allege that designation reduced its principal asset; and *St. Bartholomew's* did not consider the constitutionality of a liturgy-based religious exemption. First Covenant, conversely, objected continuously to designation; sought an exception for its house of worship; demonstrated that designation grossly reduced the value of the church's principal asset; and First Covenant challenged the constitutionality of a liturgy-based religious exception.

4. Article 1, section 11 of our state constitution, which absolutely protects the free exercise of religion, extends

broader protection than the first amendment to the federal constitution and precludes the City from imposing its Landmarks Preservation Ordinance on First Covenant's church.

5. *Michigan v. Long, supra,* holds that the Supreme Court may grant certiorari if it is not clear that adequate state grounds support a state court decision or if it is not clear that state grounds, even if adequate, independently support a holding. Our decision in *First Covenant* rested on adequate state constitutional grounds. While the independence of those grounds may have been unclear, the Supreme Court did not conclude when it granted certiorari that article 1, section 11 permits the City to designate First Covenant's church a landmark.

We reinstate our holding in *First Covenant* that applying the City of Seattle's ordinances to the church violates the free exercise guaranties of the First Amendment to the federal constitution and article 1, section 11 of the state constitution. We have fully considered the Supreme Court's holding in *Smith* II and we conclude that *Smith* II does not compel a different result.

UTTER, DURHAM, GUY, and JOHNSON, JJ., concur.

UTTER, J. (concurring) — I agree with the majority's conclusion that application of the Seattle Landmarks Preservation Ordinance (Seattle Municipal Code (SMC) 25.12) to the First Covenant Church of Seattle violates the first amendment to the United States Constitution and article 1, section 11 of the Washington State Constitution. The majority persuasively demonstrates that the United States Supreme Court's opinion in *Employment Div., Dep't of Human Resources v. Smith*, 494 U.S. 872, 108 L. Ed. 2d 876, 110 S. Ct. 1595 (1990) does not compel a different result. Nonetheless, I write separately to emphasize certain facts which require this result and to set forth federal and state constitutional standards we should apply in future cases.

## I

The majority correctly concludes that *Smith* is not controlling here because Seattle's Landmarks Preservation Ordinance (the Ordinance) is not a neutral, generally applicable law, and because its application to First Covenant Church of Seattle (hereinafter First Covenant or the Church) impacts other constitutionally protected rights. There are other reasons why the Ordinance is not generally applicable.

The Ordinance applies to an object, site or improvement which is more than 25 years old and has "significant character, interest or value, as part of the development, heritage or cultural characteristics of the City, state, or nation . . .." SMC 25.12.350. The standards for designation are highly subjective. They invite "individualized governmental assessment." *Smith*, at 884. The Landmarks Preservation Ordinance is not similar to an "across-the-board criminal prohibition". *Smith*, at 884. The process for landmark designation also indicates it is not generally applicable. Potential landmarks are individually nominated and studied to determine their consistency with the eligibility criteria. SMC 25.12-.370, .420. After public hearings and negotiation with the owner, the city council enacts a designation ordinance with site-specific controls. SMC 25.12.420, .490, .650, .660. Landmark designation is a very specialized, individual determination. As amicus Christian Legal Society so aptly put it: "What is worth preserving, like art, is in the eyes of the beholder . . .." Brief of Amicus Christian Legal Society, at 11.

The dissent ignores the fact that enforcement of criminal and tax laws does not involve such individual, subjective value judgments by governmental officials. This is evident when one compares the Seattle Landmarks Preservation Ordinance with those laws which the Court has approved as applied to religious entities. The Oregon ordinance at issue in *Smith* simply banned possession of a controlled substance except when prescribed by a medical practitioner. *Smith*, at 874 (citing Or. Rev. Stat. § 475.992(4) (1987)). In *Jimmy Swaggart Ministries v. Board of Equalization*, 493 U.S. 378,

381, 107 L. Ed. 2d 796, 110 S. Ct. 688, 691 (1990), the Court considered whether application of a California sales tax which required retailers to pay a tax " '[f]or the privilege of selling tangible personal property at retail . . .' " to the sale of religious merchandise violated the First Amendment. Neither of these statutes required a governmental entity to assess things such as the significance of character, interest or value. There was little possibility that an unscrupulous governmental official could use these statutes to discriminate against religion.

Only the Second Circuit, in *Rector, Wardens, & Members of Vestry of St. Bartholomew's Church v. New York*, 914 F.2d 348 (2d Cir. 1990), *cert. denied*, 499 U.S. 905 (1991), has concluded that a landmark ordinance was generally applicable for First Amendment purposes. The majority factually distinguishes *St. Bartholomew's*. Majority, at 214-16. I also cannot agree with the legal analysis in *St. Bartholomew's*. Even though the New York landmarks law gave the Landmarks Commission great discretion, the court concluded that it was a generally applicable regulation. 914 F.2d at 354-55. It noted that the United States Supreme Court has upheld landmark laws against claims that they are discriminatory or "reverse spot" zoning. 914 F.2d at 355 (citing *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 132, 57 L. Ed. 2d 631, 98 S. Ct. 2646, 2663 (1978). It assumed that because New York City's landmarks law was not discriminatory or "reverse spot" zoning, it was also generally applicable within the meaning of *Smith*.

The Second Circuit's analysis is incorrect. Simply because landmark designations may not be arbitrary enough to be reverse spot zoning, it does not necessarily follow that landmark laws are generally applicable where First Amendment rights are also affected. More is at stake here than the investment-backed expectations at issue in the takings context. *Penn Central*, 438 U.S. at 124, 98 S. Ct. at 2659. In *Penn Central*, the Court considered whether application of

New York City's Landmarks Preservation Law to Grand Central Terminal had "taken" its owners' property in violation of the Fifth and Fourteenth Amendments. As the majority correctly notes, the Church's First Amendment rights to free exercise and free speech are also implicated. Majority, at 216-17. While we might tolerate such broad governmental discretion where only a takings issue is involved, it does not follow that we should allow it when other liberties, such as free exercise of religion and free speech, are also affected.

Therefore, the majority correctly concludes that *Employment Div., Dep't of Human Resources v. Smith*, 494 U.S. 872, 108 L. Ed. 2d 876, 110 S. Ct. 1595 (1990) is distinguishable because, among other reasons, the Ordinance is not generally applicable. Thus, the majority properly places the burden on the City to demonstrate a compelling interest in landmark preservation. It has failed to do so.

## II

The application of the Ordinance to First Covenant's church is unconstitutional for two reasons. First, as indicated by the majority, it impacts the expression of religious beliefs. Majority, at 216-17. Second, it substantially interferes with the carrying out of the Church's religious or charitable purpose by substantially diminishing the value of its principal asset.

Although financial burdens on religious entities do not constitute a per se free exercise violation, the United States Supreme Court has indicated that an onerous financial burden can violate the First Amendment. *Swaggart*, at 392. The financial impact on First Covenant's principal asset, its church, is severe and was not disputed at the trial court level. The Church's uncontroverted affidavit stated that landmark designation reduced the value of the property from $700,000 to $400,000. Clerk's Papers, at 345-46. Affidavit of John Paul Rea. The dissent's assertion that this is a disputed fact is incorrect.

We have previously found financial burdens on churches may raise free exercise issues. In *Sumner v. First Baptist Church*, 97 Wn.2d 1, 639 P.2d 1358 (1982), we held that the application of a building code ordinance to a church school presented a free exercise claim. Here the magnitude of the financial burden is severe enough to persuade me that landmark designation violates the Church's right to free exercise.

For future cases, I still believe we should require a specific showing of hardship to justify exemption from land use restrictions. We should follow New York's courts by requiring a landmark designation not prevent or seriously interfere with the carrying out of a church's religious and charitable purposes. *See First Covenant Church v. Seattle*, 114 Wn.2d 392, 415-16, 787 P.2d 1352 (1990) (Utter, J., concurring), *cert. granted, judgment vacated and remanded*, 499 U.S. 901 (1991).

### III

The factors we outlined in *State v. Gunwall*, 106 Wn.2d 54, 59, 720 P.2d 808, 76 A.L.R.4th 517 (1986) support the majority's conclusion that Const. art. 1, § 11 guarantees greater religious freedom than its federal counterpart. I differ, however, with the majority's analysis once it has concluded Const. art. 1, § 11 provides greater protection. It does not devote enough attention to the unique language of our state constitution. Instead, after concluding that the *Gunwall* factors indicate Const. art. 1, § 11 contains broader protection than the federal constitution, it largely reverts to the use of terms used in federal First Amendment jurisprudence, such as "compelling state interest" and "least restrictive" means. Majority, at 226-28. Unlike the majority, I would devote more attention to the rich language of Const. art. 1, § 11. A truly independent state constitutional discourse cannot occur if we resort solely to federal jurisprudence in defining rights protected under our state constitution. *See* Gardner, *The Failed Discourse of State Constitutionalism*, 90 Mich. L. Rev. 762 (1991-1992) (arguing that

state courts have not developed a legitimate, independent, state constitutional discourse). Accordingly, I offer an alternative to the majority's analysis of Const. art. 1, § 11 which focuses on the unique text of that provision.

Const. art. 1, § 11 provides in pertinent part:

> Absolute freedom of conscience in all matters of religious sentiment, belief and worship, shall be guaranteed to every individual, and no one shall be molested or disturbed in person or property on account of religion; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace and safety of the state.

The majority correctly notes that words such as worship, acts, and practices indicate both belief and religiously motivated conduct are protected under our state constitution. Majority, at 224. The language of Const. art. 1, § 11 indicates the drafters considered religious belief and practice to be closely related.

This was a wise decision. Religion is to some extent a communal matter. Ritual in many religions is inseparable from one's spiritual experience of faith. *See Wisconsin v. Yoder*, 406 U.S. 205, 220, 32 L. Ed. 2d 15, 92 S. Ct. 1526, 1535-36 (1972) (acknowledging that there are situations where religious "belief and action cannot be neatly confined in logic-tight compartments").

For two additional reasons, protection of religious liberty is stronger under Const. art. 1, § 11 than under the free exercise clause of the First Amendment. First, Const. art. 1, § 11 grants Washington citizens affirmative rights that are absolute. The free exercise clause of the First Amendment only limits government action at the point of prohibiting the exercise of religion. It provides that "Congress shall make no law respecting an establishment of religion, or *prohibiting* the free exercise thereof; . . .". (Italics mine.) U.S. Const. amend. 1. Thus, the text of Const. art. 1, § 11 indicates we should start with the assumption that government may not interfere with sincerely held religious belief and religious practice.

Second, Const. art. 1, § 11 expressly limits the governmental interests that may outweigh the otherwise absolute right to religious liberty. Only the government's interest in peace and safety or in preventing licentious acts can excuse an imposition on religious liberty. The Minnesota Supreme Court in *State v. Hershberger*, 462 N.W.2d 393, 397 (Minn. 1990), interpreted similar language in its state constitution[15] to limit the types of governmental interests that may burden religious freedom. It contrasted the First Amendment's free exercise clause:

> Conversely, the free exercise clause of the first amendment has been interpreted to allow varied government interests to justify such an imposition. *See, e.g., Bowen v. Roy*, 476 U.S. 693, 707, 106 S.Ct. 2147, 2156, 90 L.Ed.2d 735 (1986) (interest in avoiding case by case inquiries in administration of social security benefits outweighs religious freedom); *Goldman v. Weinberger*, 475 U.S. 503, 508, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986) (military's interest in uniformity and discipline outweighs individual's interest in wearing yarmulke).

*Hershberger*, at 397. Therefore, landmark designation of the church is only valid if it furthers one of the limited, countervailing governmental interests listed in Const. art. 1, § 11: preventing licentious practices or acts that are inconsistent with peace and safety in our state.

Preservation of landmarks is required under the ordinance "in the interest of the prosperity, civic pride and general welfare of the people". SMC 25.12.020. Historic preservation does not prevent licentious behavior, or ensure peace or safety. While the Ordinance has a very noble aim, it simply does not further one of the limited governmental interests that the drafters of our state constitution thought important enough to infringe on religious liberty. Under

---

[15]Article 1, section 16 of the Minnesota Constitution provides in pertinent part: "The right of every man to worship God according to the dictates of his own conscience shall never be infringed; . . . nor shall any control of or interference with the rights of conscience be permitted, or any preference be given by law to any religious establishment or mode of worship; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace or safety of the state, . . .."

Const. art. 1, § 11, we need not even reach the issue of whether Seattle's interest in landmark preservation is significant. It is not the type of interest which can be furthered at the expense of religious liberty. Although my reasoning differs significantly from that of the majority, I too conclude that application of the Seattle Landmarks Preservation Ordinance to First Covenant Church violates Const. art. 1, § 11.

## IV

The landmarks designation of First Covenant's church is invalid as a violation of both the first amendment to the United States Constitution and article 1, section 11 of our state constitution. Our decision restores First Covenant's freedom to express its "purpose, theology, identity, hope, unity and reverence for the divine" through the architecture of its church facilities. Carmella, *Houses of Worship and Religious Liberty: Constitutional Limits to Landmark Preservation and Architectural Review*, 36 Vill. L. Rev. 401, 450 (1991).

JOHNSON, J., concurs with UTTER, J.

DOLLIVER, J. (dissenting) — I cannot agree with the majority's conclusions that *Employment Div., Dep't of Human Resources v. Smith*, 494 U.S. 872, 108 L. Ed. 2d 876, 110 S. Ct. 1595 (1990) (*Smith* II) does not apply to this case and that the Landmarks Preservation Ordinance (Seattle Municipal Code (SMC) 25.12) and the implementing ordinance (ordinance 112425) violate First Covenant's right of free exercise under the federal constitution and article 1, section 11 of the state constitution. Therefore, I dissent.

In *Smith* II, the Court held the First Amendment did not place the religiously motivated use of peyote beyond the reach of a criminal law which was not specifically directed at that religious practice. To do so would be contrary to First Amendment jurisprudence which has never "relieved

the individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs." *Smith* II, 494 U.S. at 879 (quoting *Minersville Sch. Dist. v. Gobitis*, 310 U.S. 586, 594-95, 84 L. Ed. 1375, 60 S. Ct. 1010 (1940)). The First Amendment is not offended "if prohibiting the exercise of religion . . . is not the *object* of the [regulation] but merely the incidental effect of a generally applicable and otherwise valid provision . . .". (Italics mine.) *Smith* II, 494 U.S. at 878. Thus, the Court held neutral, generally applicable laws which only incidentally affect religiously motivated action and which do not involve other constitutional protections do not offend the free exercise of religion. *Smith* II, 494 U.S. at 879-82.

The Landmarks Preservation Ordinance and its implementing ordinance, like the criminal prohibition against peyote use in *Smith* II, are neutral, generally applicable laws which do not involve other constitutional protections. The ordinances apply neutrally and generally to protect an object, site or improvement which is more than 25 years old and which "has significant character, interest or value, as part of the development, heritage or cultural characteristics of the City, state, or nation". SMC 25.12.350. While the landmark ordinances will affect many religious buildings because of their social and cultural importance, this does not demonstrate a lack of neutrality or general applicability. *See Rector, Wardens, & Members of Vestry of St. Bartholomew's Church v. New York*, 914 F.2d 348, 354 (2d Cir. 1990), *cert. denied*, 499 U.S. 905 (1991). Indeed, the majority admits the designation criteria in the Landmarks Preservation Ordinance are neutral. Majority, at 214.

The majority, however, asserts the implementing ordinance's two references to "liturgy", which provide an *exemption* for religiously motivated exterior changes, transform the otherwise neutral ordinance into a nonneutral one. Majority, at 214. The irony, even the perversity, of this position is apparent. The Court in *Smith* II recognized the role the political process could and has played by providing exemp-

tions in generally applicable laws for religiously motivated practices. *Smith* II, 494 U.S. at 890. Particularly, the Court endorsed legislatures which had made, even though it was not constitutionally required, "nondiscriminatory religious-practice exemption[s]" in their criminal drug laws for "sacramental peyote use". *Smith* II, 494 U.S. at 890. In this case, the Landmarks Preservation Ordinance makes no reference to religious facilities. Only the implementing ordinance, which must necessarily focus on the designated church site, is deemed not neutral because of its exception for liturgically required exterior changes. Yet, the majority uses this exemption as the reason the landmark ordinances fail the neutrality test! Incredible. This is bootstrapping of the most egregious nature.

Contrary to the inference of the majority, *Health Servs. Div. v. Temple Baptist Church*, 112 N.M. 262, 266-67, 814 P.2d 130, 134 (Ct. App. 1991) does not hold references to religious facilities render a statute per se not neutral. Rather, the court looked at the statute as a whole and found

> nothing within these statutes that detracts from their character as being generally applicable and religion-neutral. We find nothing that intimates a legislative intent to discriminatorily burden religious exercise.

*Health Servs. Div.*, at 266-67. Likewise, in this case, there is nothing in the ordinances which intimates an intent to discriminatorily burden religious exercise.

Next, the majority contends the Seattle landmark ordinances are not generally applicable and characterize them as being similar to laws in the unemployment compensation field, which remains the only context in which the Court has invalidated laws under the compelling governmental interest test set forth in *Sherbert v. Verner*, 374 U.S. 398, 10 L. Ed. 2d 965, 83 S. Ct. 1790 (1963) (*Sherbert* test). Majority, at 214-15. This majority position sweeps broader than *Smith* II justifies, is contrary to the application of *Smith* II by other courts in land use cases, and misconstrues the landmark ordinances as involving a system of individualized exemptions.

In *Smith* II, the Court attempted to create a cohesive context of free exercise jurisprudence. *See* Glendon, *Religion & the Court: A New Beginning*, 21 First Things 21, 25 (Mar. 1992). In so doing, the Court stated the *Sherbert* test had been used in the past to invalidate laws only in the unemployment compensation field but that "[i]n recent years we have abstained from applying the *Sherbert* test (outside the unemployment compensation field) at all." *Smith* II, 494 U.S. at 883 (test not used in Social Security, governmental logging and construction, military dress, and prison contexts). The Court then indicated the *Sherbert* test was inapplicable to the situation in this case because

> [t]he government's ability to enforce generally applicable prohibitions of socially harmful conduct, *like its ability to carry out other aspects of public policy,* "cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development."

(Italics mine.) *Smith* II, 494 U.S. at 885 (quoting *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 451, 99 L. Ed. 2d 534, 108 S. Ct. 1319 (1988)). Although *Smith* II concerned a challenge to a criminal prohibition, the majority recognizes that *Smith* II applies in both civil and criminal cases. See majority, at footnote 7. Because this case does not involve unemployment compensation and does involve the City's ability to carry out its public policy, the majority's assumption that the *Sherbert* test even applies in this context is erroneous. *See, e.g., Rector, Wardens, & Members of Vestry of St. Bartholomew's Church v. New York, supra*; *Salvation Army v. Department of Comm'ty Affairs*, 919 F.2d 183 (3d Cir. 1990), *cert. denied*, 499 U.S. 905 (1991); *Cornerstone Bible Church v. Hastings*, 740 F. Supp. 654 (D. Minn. 1990) (land use cases since *Smith* II which have not applied the *Sherbert* test).

The legal issue in *St. Bartholomew's* is virtually identical to that presented here. In *St. Bartholomew's*, the New York City Landmarks Preservation Commission denied the church's application to demolish a building designated as a landmark to construct a commercial office tower in its place. The build-

ing was designated a landmark pursuant to religion-neutral designation criteria similar to the ordinance in this case. As the court noted, the building had

> a special character, special historical and aesthetic interest and value as part of the development, heritage and cultural aspects of New York City . . ..

*St. Bartholomew's*, 914 F.2d at 351 (citing N.Y. Admin. Code tit. 25, § 25-305(a)(1) (1985)). Once designated, the Commission had to approve any alteration or demolition of the building designated as a landmark. St. Bartholomew's argued the Commission's denial of its application for a certificate of appropriateness for the demolition and new construction violated its right of free exercise by substantially limiting its ability to provide space for church programs and raise needed revenue. *St. Bartholomew's*, 914 F.2d at 353-54.

The court held *Smith* II applied, noted the landmark law would affect many religious buildings, but concluded the law was a valid, neutral regulation of general applicability because there was no "evidence of an intent to discriminate against, or impinge on, religious belief in the designation of landmark sites." *St. Bartholomew's*, 914 F.2d at 354. Similarly, First Covenant has presented no evidence of such discriminatory intent.

The majority's attempt to distinguish *St. Bartholomew's* on the facts is unconvincing. Free exercise, if applicable at all in the landmark preservation arena, should not depend on when a church objects to a regulation, whether the affected building is an adjunct or a main church building, or whether the claimed financial restrictions are characterized as a reduction in market value or revenue generation. Majority, at 215-16. These matters are simply irrelevant under the *Smith* II analysis. Moreover, the landmark law in *St. Bartholomew's* did not have an exception for alterations required by liturgy, which is present here.

To the extent the *Sherbert* test has "some life beyond the unemployment compensation field", it clearly will not be extended to neutral, generally applicable laws. *Smith* II, 494 U.S. at 884. The landmark ordinances, like the criminal

prohibition in *Smith* II and the tax laws, are generally applicable. They apply to an object, site or improvement which is 25 years old and which

> has significant character, interest or value, as part of the development, heritage or cultural characteristics of the City, state, or nation . . ..

SMC 25.12.350. The designating ordinance implements the general landmarks ordinance and is defined as

> an ordinance enacted pursuant to this chapter for the purpose of declaring an object, improvement or site a landmark, or a landmark site, and specifying the controls and any economic incentives applicable thereto, and shall include any ordinance designating a landmark in accordance with Ordinance 102229.

(Footnote omitted.) SMC 25.12.110. The majority asserts the ordinances contain mechanisms for individualized exceptions similar to unemployment compensation rules. Majority, at 214-15. In support of this position, the majority points to sections 3.01, 6.01, 8.01 and 9.05 of ordinance 106348 (the Landmarks Preservation Ordinance). Majority, at 215. Section 3.01 sets forth the standards for designating landmark sites. Typical of such standards are:

> It is the location of, or is associated in a significant way with, an historic event with a significant effect upon the community, City, state, or nation . . ..

SMC 25.12.350(A) (ordinance 106348 § 3.01 (1977)). Section 6.01 requires that the Landmarks Preservation Board hold a public hearing on whether the proposed site meets the criteria for landmark designation before approving or denying the designation of a site. SMC 25.12.420 (ordinance 106348 § 6.01 (1977)). Section 8.01(a) requires the Board to negotiate with the owner of a designated site as to the particular controls needed to preserve the unique characteristics of the site. SMC 25.12.490 (ordinance 106348 § 8.01(a) (1977)). Section 8.01(b) sets forth the time limits and procedures for these negotiations. SMC 25.12.500 (ordinance 106348 § 8.01(b) (1977)). Section 9.01 provides that the owner of the site and any interested person may file objec-

tions to the controls and incentives proposed by the Board. SMC 25.12.530 (ordinance 106348 § 9.01 (1977)).

None of these sections "invite consideration of the particular circumstances behind" or are concerned about the "reasons" why the site does or does not meet the designating criteria. *Smith* II, 494 U.S. at 884. In contrast, the unemployment compensation laws are concerned not only with whether one meets the criteria of unemployment, but also look to the reasons why the person is unemployed. The landmark ordinances, however, apply to all sites and provide, similar to the function of the criminal law, a procedure to determine whether the designating criteria are met. Once the criteria are held to be satisfied, there is no provision in the landmark ordinances which is comparable to the individualized assessments necessarily required by the "good cause" exception to entitlement to unemployment compensation benefits. *Cf. Bowen v. Roy*, 476 U.S. 693, 90 L. Ed. 2d 735, 106 S. Ct. 2147 (1986) (no individual exemptions from requirement that all applicants under Aid to Families with Dependent Children provide Social Security number to state welfare agencies); *American Friends Serv. Comm'ty Corp. v. Thornburgh*, 941 F.2d 808, 811 (9th Cir. 1991) (exceptions for entire categories of employees from provisions in the Immigration Reform and Control Act were not individualized exemptions within meaning of *Smith* II).

The sections concerning controls and incentives for each designated site do not exempt or except that site from landmark status, like the "good cause" exception removes entitlement to unemployment benefits. Rather, the controls and incentives are more akin to the various exemptions and deductions available in generally applicable tax laws and the provisions for negotiation represent the type of accommodation we have endorsed in the past. *See Sumner v. First Baptist Church*, 97 Wn.2d 1, 9-10, 639 P.2d 1358 (1982).

Nor does this case present the hybrid situation provided for in *Smith* II. Even assuming secular design regulation of the exterior of a church violates free speech, which I am far

from convinced it does, the landmark ordinances cannot restrict the church's expression of religious belief because the City has agreed that exterior changes required by liturgy are removed from the landmark regulations.

The church has also failed to show how the Seattle ordinances burden its free exercise, either administratively or financially. The administrative burden the majority asserts impermissibly burdens free exercise boils down to the City's ability to "bring the Church and the religious question [whether the exterior change has a bona fide liturgical base] before the courts". Majority, at 221-22. This results because the exception endorses liturgically based exterior changes and places exclusive authority in the church to determine when changes are required by liturgy.

> Provided further that nothing herein shall prevent any alteration of the exterior when such alterations are necessitated by changes in liturgy, *it being understood that the owner is the exclusive authority on liturgy and is the decisive party in determining what architectural changes are appropriate to the liturgy.*

(Italics mine.) Ordinance 112425; Clerk's Papers, at 174. The City has agreed that exterior changes necessitated by liturgy are exempted from normal landmark regulations. *See First Covenant Church v. Seattle*, 114 Wn.2d 392, 417-18, 787 P.2d 1352 (1990) (Dolliver, J., dissenting), *cert. granted, judgment vacated and remanded*, 499 U.S. 901 (1991).

Once the true nature of the majority's purported "administrative burden" is properly understood, it is apparent that it is not the type of burden which is protected by the First Amendment. Although, clearly, courts will not presume "to question the *centrality* of particular beliefs or practices to a faith" (italics mine), *Smith* II, 494 U.S. at 887 (quoting *Hernandez v. Commissioner*, 490 U.S. 680, 699, 104 L. Ed. 2d 766, 109 S. Ct. 2136 (1989)), no court has stretched the free exercise clause to the point where establishing *the fact of religious motivation* for conduct, or, in this case, a liturgical base for an exterior change, is considered, by itself, a religious hardship. Those wishing to shield their conduct under

the First Amendment from otherwise valid governmental regulation must first show they merit its broad protections. *See Wisconsin v. Yoder*, 406 U.S. 205, 216, 32 L. Ed. 2d 15, 92 S. Ct. 1526 (1972); *United States v. Seeger*, 380 U.S. 163, 185, 13 L. Ed. 2d 733, 85 S. Ct. 850 (1965). To hold otherwise, as does the majority, would indeed "permit every citizen to become a law unto himself." *Smith* II, 494 U.S. at 879 (quoting *Reynolds v. United States*, 98 U.S. 145, 25 L. Ed. 244 (1879)).

The church has also failed to show an unconstitutional financial burden. First, the alleged reduction in market value caused by the designation is a disputed fact in this case. The reduction is based upon one appraisal, which is disputed by the City, and which was never the subject of fact finding by the trial court. Even if the reduction is taken as fact, the church has not shown the alleged reduction prohibits or interferes with religious practice. *See Sumner*, 97 Wn.2d at 21 (Dolliver, J., dissenting).

> The central question in identifying an unconstitutional burden is whether the claimant has been denied the ability to practice his religion or coerced in the nature of those practices.

*St. Bartholomew's*, 914 F.2d at 355.

Lastly, I would find no violation of article 1, section 11 of the Washington State Constitution. As discussed above, the administrative burden of showing that an exterior change has, in fact, a liturgical base is not a burden which the First Amendment or article 1, section 11 of the Washington State Constitution can protect. The church must be required to show that its conduct falls within the protections afforded by the First Amendment and article 1, section 11 of the Washington State Constitution. *See Sumner*, 97 Wn.2d at 14 (Utter, J., concurring). In addition, the church has failed to show the Seattle landmark ordinances create an impermissible financial burden under Const. art. 1, § 11; the reduction in market value is a disputed fact and the church has presented no evidence the alleged reduction interferes with its religious practice. *See Sumner*, 97 Wn.2d at 7-10; *First Covenant Church*,

114 Wn.2d at 415 (Utter, J., concurring) (land use restriction must interfere "markedly with a church's ability to perform its mission").

I would hold the landmark ordinances are neutral, generally applicable laws which neither implicate the free exercise clause of the First Amendment nor violate article 1, section 11 of the Washington State Constitution. The protections afforded by the federal and state religion clauses are not properly invoked when a claimant has not been denied the ability to practice his religion or coerced in the nature of those practices. To hold the religion clauses applicable in this context denigrates their true meaning and unjustifiably limits the City's efforts to preserve the cultural assets of the City in the interest of the general welfare. *See* SMC 25.12-.020(A).

BRACHTENBACH and SMITH, JJ., concur with DOLLIVER, J.

Reconsideration denied January 6, 1993.