# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| CAROL A. HENRY,<br><br>     Appellant,<br><br>  v.<br><br>THE WASHINGTON DEPARTMENT OF FISH AND WILDLIFE,<br><br>     Respondent. | No. 59241-0-II<br><br><br><br>UNPUBLISHED OPINION |

VELJACIC, A.C.J. — This case arises out of Carol Henry's dispute with the Department of Fish and Wildlife (DFW), arising from its requirement that she vaccinate herself against COVID-19. The trial court dismissed her case at summary judgment.

Henry raises two issues on appeal following summary judgment. First, she argues that the trial court erred when it dismissed her civil tort cause of action under article I, section 11 of the Washington Constitution for violation of her right to freely exercise her religion. Second, she argues that the court erred when it dismissed her claim for discrimination on the basis of creed or religion in violation of the Washington Law Against Discrimination (WLAD), RCW 49.60.180.

We conclude that, in this case, the trial court did not err when it dismissed Henry's constitutional claim because Henry has not established why a claim under the WLAD is inadequate. We also conclude that the trial court erred when it dismissed Henry's claim under the WLAD because there are genuine issues of material fact regarding the sincerity of Henry's

religious beliefs against vaccinations, whether in-person contact is an essential function of Henry's position such that DFW's burden to show that accommodating Henry in her then-current position posed an undue hardship, and whether DFW's budgeting position was a reasonable accommodation.

Accordingly, we affirm the trial court's dismissal of Henry's article I, section 11 claim, and reverse and remand on the trial court's dismissal of Henry's WLAD claim.

FACTS

I.    BACKGROUND

A.    Appellant Henry

Henry began working for DFW in 1998. In 2018, Henry was promoted to a Habitat Biologist 2 (Bio 2) position. As a Bio 2, Henry was responsible for evaluating various applications for potential impact on fish life and habitat. The position required desk-work and "periodic fieldwork." Clerk's Papers (CP) at 213. In her second declaration, Henry expressed that in-person contact requirements of the job were minimal; she stated the following:

> The applications I evaluated and the reference materials I used in evaluating the applications were available on the internet. In the field I was usually alone. The substantial majority of my time was spent at a desk, reviewing and evaluating applications, doing research needed for evaluating applications and drafting reports regarding applications. A small portion of my time was spent in the field on site visits that were part of evaluations and in[-]person meetings.

CP at 171.

The position required "relief in the aspects of the Bio 3 workload." CP at 211. According to Henry, her job "was support for Bio 3s, performing tasks Bio 3s had done, thereby freeing them up to do other work." CP at 171. Henry also attested that "many tasks can be performed either by a Biologist 2 or by a Biologist 3." CP at 31.

2

B.        Executive Response to COVID-19

On February 29, 2020, Governor Jay Inslee declared a state of emergency in response to the COVID-19 pandemic.[1]   In March of 2020, DFW adopted a work from home policy for employees, "except when in the field."  CP at 29.  When meeting in the field, DFW employees drove separately, wore masks, and socially distanced.[2]

In August 2021, the Governor issued Proclamation 21-14, soon amended by Proclamation 21-14.1, generally prohibiting executive state agency workers and health care workers from remaining employed after October 18, 2021, unless fully vaccinated against COVID-19.[3]   "A person is fully vaccinated against COVID-19 two weeks after they have received the second dose in a two-dose series of a COVID-19 vaccine (e.g., Pfizer-BioNTech or Moderna) or a single dose COVID-19 vaccine (e.g., Johnson & Johnson (J&J)/Janssen) authorized for emergency use, licensed, or otherwise approved by the [U.S. Food and Drug Administration (FDA)] or listed for

---

[1]  Proclamation by Governor Jay Inslee, No. 20-05 (Wn. Feb. 29, 2020), https://governor.wa.gov/sites/default/files/2023-01/20-05%20Coronavirus%20%28final%29.pdf.

[2] Henry estimated that she worked "alone 86% of [her] work time and with others 14% of [her] work time." CP at 30.

[3]  Proclamation by Governor Jay Inslee, No. 21-14 (Wn. Aug. 9, 2021), https://governor.wa.gov/sites/default/files/proclamations/21-14%20-%20COVID-19%20Vax%20Washington%20%28tmp%29.pdf (later amended to include educational employees and on-site contractors who contract with certain state agencies. Proclamation by Governor Jay Inslee, No. 21-14.1        (Wn.        Aug.        20,        2021), https://governor.wa.gov/sites/default/files/proclamations/21-14.1%20-%20COVID-19%20Vax%20Washington%20Amendment.pdf;  Proclamation by Governor Jay Inslee, No. 21.14.2 (Wn. Sep.27,                                                                2021), https://governor.wa.gov/sites/default/files/proclamations/21-14.2%20-%20COVID-19%20Vax%20Washington%20Amendment%20%28tmp%29.pdf.

emergency use or otherwise approved by the World Health Organization."[4] CP at 186. The Proclamation included exemptions to the vaccination requirement for disability and religious accommodations pursuant to the Americans with Disabilities Act (ADA), Title VII of the Civil Rights Act of 1964 (Title VII), the WLAD, "or any other applicable law to a disability-related reasonable accommodation or a sincerely held religious belief accommodation."[5]

On September 7, 2021, the State through DFW and the Washington Association of Fish and Wildlife Professionals (Henry's union), issued a memorandum of understanding which recognized COVID-19's "ongoing and present threat in Washington State." CP at 111. The memorandum asserted that "COVID-19 vaccines are effective in reducing infection and serious disease and widespread vaccination is the primary means we have as a state to protect everyone." CP at 111. The memorandum further stated that "[w]idespread vaccination is also the primary means we have as a state to protect our health care system, to avoid the return of stringent public health measures, and to put the pandemic behind us." CP at 111.

The memorandum required all employees to be fully vaccinated against COVID-19 by October 18, 2021, unless approved for an exemption. Employees could request a medical or religious exemption. Approved exemptions proceeded to the accommodation process, wherein DFW would conduct a "diligent review and search for possible accommodations within the agency." CP at 112. DFW would then "determine whether an employee is eligible for a reasonable

---

[4] Proclamation by Governor Jay Inslee, No. 21-14.1 (Wn. Aug. 20, 2021), https://governor.wa.gov/sites/default/files/proclamations/21-14.1%20-%20COVID-19%20Vax%20Washington%20Amendment.pdf.

[5] Proclamation by Governor Jay Inslee, No. 21-14 (Wn. Aug. 9, 2021), https://governor.wa.gov/sites/default/files/proclamations/21-14%20-%20COVID-19%20Vax%20Washington%20%28tmp%29.pdf.

accommodation," and "attempt to accommodate the employee in their current position prior to looking at accommodations in alternative vacant positions." CP at 112.

II.    HENRY'S RELIGIOUS EXEMPTION & ACCOMMODATION

On or about August 24, 2021, Henry requested a religious exemption and was later approved. However, while DFW approved the religious exemption, it decided that she was not eligible for a reasonable accommodation within her Bio 2 position.

On September 30, 2021, DFW addressed a letter to Henry that stated the following:

> In considering your request for accommodation, the department has evaluated the essential functions of your position as well as business requirements for workplace safety. Performing the essential functions of your position unvaccinated poses a threat to the health or safety of yourself and others while in the workplace.
> After carefully reviewing your essential functions in your job description, working environment, and your management's feedback, it has been determined that **no reasonable accommodation** can be made in your current position. This determination was made because your position must at times be done in the physical presence of others. There are no other accommodations for your position available which sufficiently mitigate or eliminate the risk associated with having an unvaccinated employee performing the essential functions of your position.
> Reassignment remains a possibility, although opportunities may be limited.

CP at 218. The letter gave Henry the contact information for a "Reasonable Accommodation Specialist" should Henry "like to explore any available reassignment options." CP at 218.

On October 6, 2021, following a meeting between Henry and Margen Carlson, DFW's Habitat Program Director, Carlson sent an e-mail to Henry explaining that a "reasonable accommodation is assistance, support, tools, or other arrangements to enable someone to perform the duties of the job. It doesn't include adjusting or minimizing the duties of [sic] job." CP at 192. Carlson stated that she "believe[s] that collaboration to solve problems, interpret field conditions, and train and improve our work is critical to the role of a Bio 2." CP at 192. Carlson acknowledged that Henry's job "may not have been focused on these functions in recent months." CP at 192.

She then reiterated that "these collaborative functions continue to be part of the vision and job duties I helped create for regional Bio2s. It isn't reasonable for me to commit your team, the program, and the agency to a working arrangement that would prevent us from asking you to complete the collaborative tasks in your job." CP at 192. Carlson further stated, "[g]iven the permanent framework of the proclamation and [reasonable accommodations], and the importance of collaborative functions in your work, I can't support an accommodation to further minimize, eliminate, or give these functions to other team members." CP at 192.

Also on or about October 6, 2021, Amy Spoon (supervisory role over Henry wrote an e-mail to her colleagues, which stated the following:

> If [Henry's] request is ultimately denied, I feel that it is reasonable to provide her with an explanation of exactly what undue hardship would result from providing her reasonable accommodation. If it is solely that it would place extra work on the plates of others, I would have to disagree to some degree in this specific situation. There are job duties that I can shift from the Bio 3's (that require zero human contact) to [Henry's] Bio 2 position. This would take workload off of the Bio 3s. If [Henry] were to leave all together, this will place a large burden on the Bio 3's in our area. I know this would be temporary as we would try to hire a new person, but allowing a TEMPORARY [REASONABLE ACCOMMODATION] may result in some burden, but this should be temporary. In my opinion the potential burden placed on the other Bio3's during length of a temporary [reasonable accommodation] for [Henry] would be far less than the temporary burden that would be placed on them not having anyone in that position while the entire hiring process takes place, and then after that, the amount of time spent training a new person to get them up to the level at which [Henry] functions as a Bio 2.
> [Henry] laid out her time spent working alone vs. with others very well. Has anything been discussed in other situations of simply reducing overall hours worked?
> . . . In my opinion, [Henry] has a unique position, and the nature of her position lends itself to be able to identify some changes to job duties to all [sic] her a [reasonable accommodation]. I don't really agree that she should be lumped into the same melting pot of every other position seeking [reasonable accommodation].

CP at 194.

Related to this, Henry stated the following in her second declaration:

Around the time Amy Spoon sent her note to colleagues, Ms. Spoon and I briefly discussed the tasks she envisioned [to] assign[] me if DFW allowed. Ms. Spoon said that she envisioned assigning me tasks that were within my job description as a Bio 2. Either by allowing me to continue working as I had been for approximately 20 months under the work from home policy or by allowing Amy Spoon to assign me tasks within my job description that required no in[-]person contact, DFW could have accommodated my religious belief with trifling effort.

CP at 31-32.

On October 8, 2021, DFW addressed another letter to Henry stating:

After carefully reviewing the essential functions in your job description, working environment, your management's feedback, and additional information provided by you, information presented during the meeting on October 6, 2021 and guidance provided by the agency concerning accommodations, it has been determined that **no reasonable accommodation** can be made in your current position. This determination was made because your position must at times be done in the physical presence of others. There are no other accommodations for your position available which sufficiently mitigate or eliminate the risk associated with having an unvaccinated employee performing the essential functions of your position. . . .
Reassignment remains a possibility, although opportunities may be limited.

CP at 221 (emphasis in original).

Carlson sent Henry an e-mail, again reiterating that "interacting with others is an important part of all regional Bio 2 positions, and as we discussed, a reasonable accommodation is means to help someone complete the essential functions of their job, not modifying the essential functions of the job to meet the individual needs." CP at 195. Carlson told Henry that Henry's "position must at times be done in the physical presence of others. There are no other accommodations for your position available which sufficiently mitigate or eliminate the risk associated with having an unvaccinated employee performing the essential functions of your position." CP at 196.

Henry was terminated from her Bio 2 position on October 18, 2021. Henry stated that, at the time, she worked by herself "either at home or in the field approximately 90 percent–96 percent of the time. I think it was 96 or 94 percent." CP at 241.

Explaining DFW's decision, Carlson stated:

I reviewed Ms. Henry's job description, as well as received input from others within the Habitat Program and Ms. Henry. I determined that Ms. Henry was unable to perform all the essential functions of her Biologist 2 position based on the risk associated with her unvaccinated status. Specifically, I determined that the essential functions of Ms. Henry's Biologist 2 position included requirements that she be in the physical presence of others, both the public and other DFW employees. I also determined that removing these essential functions from Ms. Henry's biologist 2 position, while adding other work functions from other job classifications, produced an undue hardship on the agency. . . .

. . . Because of my determinations described above, I determined that DFW was unable to provide Ms. Henry a Reasonable Accommodation in her current Biologist 2 position.

CP at 209.

Carlson then attested to the following regarding another position offered to Henry as a

reasonable accommodation:

Following this, Ms. Henry was offered to be reassigned to a Budget Analyst position as a reasonable accommodation. The Budget Analyst position was offered because it could be done fully remotely, and did not have essential functions that required Ms. Henry to be in the physical presence of others. Ms. Henry accepted that position and continues to be employed at DFW in that positions as of the date of this declaration.[6]

CP at 209.

However, Henry attested the following on July 3, 2022:

A few days after DFW terminated my [Bio 2] position, the agency offered and I accepted a temporary position as a Budget Analyst that allowed me to work from home.

CP at 174. During Henry's aforementioned January 26, 2023 deposition, the following exchange

between Henry and DFW's counsel took place:

[DFW]: . . . So we were talking about the reasonable accommodation, and you were going to tell me about the process once you received the email about

---

[6] DFW argues that Henry was offered the alternative position *before* she was terminated from her Bio 2 position.

reasonable accommodation—the process that you went through to request a reasonable accommodation.

[Henry]: I received an email saying that there was a possibility, and I needed to respond back to that email, which I did. And I said I would be open to a reasonable accommodation. And eventually they responded to me and said they had a position in the budget office they could put me in.

[DFW]: Okay. So you were accommodated through another position—or being provided another position as a budget analyst?

[Henry]: I was. They accommodated me by making me a Budget Analyst 1 for temporary part-time.

[DFW]: Okay. Are you still in that position now?

[Henry]: I am still in the budget office.

. . . .

[DFW]: Okay. So let's go back to your reasonable accommodation request in the Bio 2 position. Obviously they accommodated you by giving you the budget analysis position, but what is it that you had hoped would have been your accommodation?

[Henry]: I hoped and thought my accommodation should be where I was as a Habitat Biologist 2.

CP at 240-41.

On November 8, 2021, Henry started her new budget analyst role.[7] Henry attested that this position was temporary, part-time, paid less,[8] and subject to "terminat[ion] without notice." CP at 32. Henry remained a part-time employee until May 2022. Henry moved to another temporary budget analyst position before eventually accepting a permanent position as a Budget Analyst 3 on June 1, 2023.

Henry stated the following in her 2022 declaration:

Termination of my [Bio 2] position caused substantial diminution in both my employee status and income.
. . . .
The department's refusal to accommodate my religious belief and the threat of terminating my employment were very coercive. As a single person with a house payment I knew that my financial future was at risk. In the face of substantial

---

[7] Henry's declaration states "November 2020." However, given that the preceding events occurred in up through October 2021, this appears to be in error.

[8] Similar "November 2020" apparent error in Henry's declaration.

coercion by DFW I lived up to my religious belief. This ordeal has been a huge hardship. It has been the most difficult experience of my life.

CP at 32-33.

Henry is currently employed by DFW.

III.    HENRY'S RELIGIOUS BELIEFS

In 2022, Henry attested via declaration that her "[l]ongstanding religious belief prohibits [her] from being vaccinated against COVID-19." CP at 172. At Henry's deposition on January 6, 2023, the following question-and-answer regarding Henry's religious beliefs and vaccinations occurred between Henry and DFW's counsel:

> [DFW]: What about the flu shot?
> [Henry]: No.
> [DFW]: Have you ever received an injection as an adult at all?
> [Henry]: When I was young in my 20s I had a tetanus shot. And at the same time in my early 20s I had a globulin shot.
> . . . .
> [DFW]: Okay. How about medical interventions? Do you visit a doctor on a regular basis?
> [Henry]: Yes, I do.
> [DFW]: Okay. What about medication? Do you take any medication?
> [Henry]: I have taken prescription medication, but I am not currently on anything.
> . . . .
> [DFW]: So I want to go back to your comment on fetal embryos. So if there was a vaccination that was not developed utilizing fetal embryos, would that change your decision or alter your decision in any way?
> [Henry]: I believe there currently is a shot for COVID that does not utilize fetal embryos, and, no, I wouldn't. That wouldn't change.
> [DFW]: Why wouldn't it change?
> [Henry]: Because I'm not trusting in shots. I'm trusting in the Lord.
> . . . .
> [DFW]: [S]o [sic] your basis for not wanting to receive vaccinations generally is that you believe that your healing should be from a spiritual standpoint versus a medical standpoint.
> I'm trying to understand what in your faith says that you are prohibited from receiving vaccinations.
> [Henry]: I'm not being told that I am being prohibited from getting vaccinations.

[DFW]: So your faith does not prohibit you from receiving vaccinations. It's more of a question the way your faith says that you should heal.

. . . .

[Henry]: I trust the Lord to take care of me—not just in medical procedures, in everyday life. When I thought I was losing my job, I put my trust in him to take care of me however that was going to look. So it's about who do I put my trust in. Do I trust the Lord or do I not? And that is where my faith is.

[DFW]: Okay. But there's nothing in your faith that says that you cannot—that you're prohibited from receiving vaccinations?

[Henry]: There's nothing that says I'm prohibited.

[DFW]: Okay. Understood.

[Henry]: And, as an example, about two years ago I was out in the woods and I was jabbed in the leg by an old rusty logger's cable. And it was bleeding, and it was ugly looking. And when I came into the—I cleaned it up out in the woods. And when I came in I reported to Megan "Hey, just so you know, I got my leg cut on a rusty cable today." And she told me to run. Go get a tetanus shot. Most people would have done that. I did not go get a tetanus shot because I trusted that the Lord would keep me safe from tetanus.

[DFW]: Got it.

[Henry]: And I didn't get, you know, tetanus.

CP at 237-39.

On July 10, 2023, Henry stated through a declaration the following:

DFW claims that being vaccinated is not contrary to my religious belief, that in deposition I could not point to any writing in my church that is the basis for my belief. In college I majored in Math and the Bible. My religious belief regarding vaccination is based on my understanding of the comprehensive teachings of my church and my reading of the Bible, but I cannot point to any writing that explicitly says "do not get vaccinated."

I try to live my life in accordance with my religious belief. In 2020 I got shingles, which was quite painful. Health care providers informed me several times that I can get shingles again and strongly advised to be vaccinated against the disease. Around 2021, while I was at work working alone in the woods, I suffered a puncture wound caused by a rusty logging cable.[9] Later that day, my supervisor encouraged me to get vaccinated against tetanus. I knew that tetanus is very painful and potentially deadly. Both times, because vaccination violates my religious belief, I chose not to get vaccinated.

CP at 32-33.

---

[9] Apparently, the same event as above.

IV.    PROCEEDINGS BEFORE THE TRIAL COURT

A.    Henry's Complaint

Henry brought suit against DFW under several theories, including violation of the Washington Constitution's Religious Freedom Amendment, the First Amendment of the United States Constitution, the WLAD, and Title VII.  Henry also claimed that DFW's actions were ultra vires and violated Proclamation 21.14.1.

Henry asked the court to "[o]rder [DFW] to return Ms. Henry to her full time position as a Habitat Biologist," for damages for "wrongly denied' compensation, and for other monetary and equitable damages.  CP at 161.

B.    Henry's Second Motion for Partial Summary Judgment[10]

On August 19, 2022, the court denied Henry's second motion for partial summary judgment, ruling that as a matter of law that there existed no constitutional tort cause of action under article I, section 11.  The court also ruled in the alternative, in reference to article I, section 11's exception that the vaccination requirement was "based upon public health and safety," and applied and determined that DFW's accommodation process here passed the rational basis test.  CP at 231.

C.    DFW's Motion for Summary Judgment

On July 21, 2023, the trial court granted DFW summary judgment on all of the remaining issues.  The court dismissed Henry's causes of action for violation of her First Amendment rights and Title VII of the Civil Rights Act.  The court dismissed Henry's *ultra vires* cause of action.[11]

---

[10] The record provided to us provides information for only two motions for summary judgment—Henry's second motion and DFW's motion (at issue here).

[11] The ultra vires claim includes the violation of Proclamation 21-14.1 claim.

12

The court dismissed Henry's constitutional tort cause of action under article I, section 11 based on its previous ruling (in Henry's second motion for partial summary judgment, above).

The court also dismissed Henry's claim under the WLAD.

Henry appeals the trial court's dismissal of her constitutional tort cause of action for violation of her religious freedom under article I, section 11. She also appeals the trial court's dismissal of her religious discrimination claim under the WLAD.

## ANALYSIS

We review an order granting summary judgment de novo, engaging in the same inquiry as the trial court. *Walston v. Boeing Co.*, 181 Wn.2d 391, 395, 334 P.3d 519 (2014); *Christensen v. Grant County Hosp. Dist. No. 1*, 152 Wn.2d 299, 305, 96 P.3d 957 (2004). "Summary judgment is appropriate only if 'there is no genuine issue as to any material fact' and 'the moving party is entitled to a judgment as a matter of law.'" *Walston*, 181 Wn.2d at 395 (quoting CR 56(c)). "All facts must be considered in the light most favorable to the nonmoving party." *Id.* "Summary judgment is granted only if, given the evidence, reasonable persons could reach only one conclusion." *Id.* "The moving party bears the initial burden 'to prove by uncontroverted facts that there is no genuine issue of material fact.'" *Welch v. Brand Insulations, Inc.*, 27 Wn. App. 2d 110, 115, 531 P.3d 265 (2023) (quoting *Jacobsen v. State*, 89 Wn.2d 104, 108, 569 P.2d 1152 (1977)). "If this burden is satisfied, the nonmoving party must present evidence demonstrating material fact." *Walston*, 181 Wn.2d at 395-96.

I.      ARTICLE I, SECTION 11 RELIGIOUS EXERCISE CLAIM FOR DAMAGES

Henry argues for the recognition of a constitutional tort cause of action for damages under article I, section 11 because without it, she would not benefit from the protection of strict scrutiny. We decline to recognize such a cause of action in this case.

A.    Washington Judicial History of Constitutional Tort Causes of Action

The Washington Constitution protects religious freedom.   Article I, section 11 of the Washington Constitution provides, in relevant part:

Absolute freedom of conscience in all matters of religious sentiment, belief and worship, shall be guaranteed to every individual, and no one shall be molested or disturbed in person or property on account of religion; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace and safety of the state.

In 1902, the Washington Supreme Court recognized a cause of action, "subsequently known as 'inverse condemnation,'" based on article I, section 16 of the Washington Constitution. *Sys. Amusement, Inc. v. State*, 7 Wn. App. 516, 519, 500 P.2d 1253 (1972); *Brown v. Pierce County*, 28 Wash. 345, 347-49, 68 P. 872 (1902) (where private property was seized without compensation by public health officers for the purpose of quarantining persons afflicted with smallpox, the home on the property was destroyed by fire); *see generally Wilshire v. City of Seattle*, 154 Wash. 1, 2-3, 280 P. 65 (1929) (where the city took possession without providing compensation of a private tract of shore land in order to operate a power plant).  Recognition of an inverse condemnation cause of action provided a remedy for violation of the principle that the state cannot take private property without compensation.  *Wilshire*, 154 Wash. at 6.  Thus, a direct constitutional cause of action for damages was born to address a deficiency in available remedies. *Brown*, 28 Wash. at 347-49; *Wilshire*, 154 Wash. at 6; *see Sys. Amusement, Inc*., 7 Wn. App. at 519.

In contrast, in 1972, the Court of Appeals held that there is no cause of action for money damages under article 1, section 3 for due process violations.  *Sys. Amusement, Inc.*, 7 Wn. App. at 518-19.  "Acts violative of the [due process] clause may be declared void by the courts, but the clause does not, of itself, provide the remedy of reparation."  *Id*. at 518.  Subsequently, in *Spurrell*

14

*v. Bloch*, 40 Wn. App. 854, 861-62, 701 P.2d 529 (1985), the court held that "[t]he constitutional guarantee of due process, [WASH.] CONST. art. 1, § 3, does not of itself, without the aid of augmenting legislation, establish a cause of action for money damages against the state."[12]

Further developments occurred in 1998 in a case where county medical examiner staff appropriated autopsy photographs of corpses for personal use, the plaintiff brought multiple causes of action, including a common law invasion of privacy action and a privacy claim constitutional tort under article I, section 7.  *See generally Reid v. Pierce County*, 136 Wn.2d 195, 198-99, 961 P.2d 333 (1998).  The Supreme Court in *Reid* determined that the plaintiffs could "obtain adequate relief under the common law and that such actions are better addressed under the common law invasion of privacy action."  *Id.* at 213.  The court "reserve[d] the question of whether a plaintiff may maintain a civil cause of action for violation of our state constitution for another day."  *Id.* at 214.  However, the court articulated the basis upon which such a cause of action might be constructed.  *Id.* at 213-14.  It articulated that plaintiffs seeking the recognition of a cause of action under the Washington Constitution must present a "reasoned or principled basis upon which to construct a constitutional cause of action," and they must establish "why a constitutional cause of action is more appropriate than the common law cause of action which already exists."  *Id.*

A few years later, the need for augmenting legislation again took a central role.  The Court of Appeals, citing *Systems Amusement*, *Spurrell*, and *Reid* did not recognize a cause of action for a free speech violation under article I, section 5, because Washington courts have consistently rejected invitations to establish a cause of action for damages based on constitutional violations without the aid of augmenting legislation.  *Blinka v. Wash. State Bar Ass'n*, 109 Wn. App. 575,

---

[12] The remedy for a due process violation is for proper due process or for a person to have "his day in court."  *See Sys. Amusement, Inc.*, 7 Wn. App. at 518.

589-91, 36 P.3d 1094 (2001). No Washington case has recognized tort damage claims for an alleged violation of the state constitution without the aid of [augmenting] legislation. *See Blinka v. Wash. State Bar Ass'n,* 109 Wn. App. 575, 591, 36 P.3d 1094 (2001).[13]

Notably, while direct constitutional causes of action for violation of religious freedom under article I, section 11, have been recognized, these claims were brought as declaratory judgment actions, not claims for damages. *See City of Woodinville v. Northshore United Church of Christ*, 166 Wn.2d 633, 641-45, 211 P.3d 406 (2009) (where the court held unconstitutional a city one-year moratorium on permitting to allow homeless encampments to prevent a church from hosting such an encampment on its property); *see Munns v. Martin*, 131 Wn.2d 192, 207-10, 930 P.2d 318 (1997) (where the court held unconstitutional a burdensome ordinance creating up to a 14-month delay preventing the Catholic church from demolishing a Catholic school); *see First United Methodist Church of Seattle v. Hr'g Exam'r for Seattle Landmarks Pres. Bd*., 129 Wn.2d 238, 245-53, 916 P.2d 374 (1996) (where the court held unconstitutional a city landmarks ordnance preventing a church from selling its property); *see First Covenant Church of Seattle v. City of Seattle*, 120 Wn.2d 203, 226-28, 840 P.2d 174 (1992) (where the court held unconstitutional a city landmarks ordinance that prevented a church from altering its exterior).

B.      Legal Principles

We find the Supreme Court's opinion in *Reid* controlling. Under *Reid*, to justify the recognition of a new cause of action under the Washington Constitution, the existing remedy, here the WLAD, must be shown by the plaintiff to be inadequate.[14] 136 Wn.2d at 213. Those seeking

---

[13] *Blinka* cites to *Reid* (privacy claim under article I, § 7), and to *System Amusement* and *Spurrell* (due process claims under article I, § 3), but does not mention *Brown* or *Wilshire* (takings cases which created inverse condemnation under article I, § 16). *Blinka*, 109 Wn. App. at 589-91.

[14] By implication, the opposite of "adequate."

16

recognition of the cause of action have the burden of "present[ing] a reasoned or principled basis upon which to construct a constitutional cause of action." *Id.* at 213-14. They must also establish "why a constitutional cause of action is more appropriate" than existing causes of action. *Id.* at 214.

The *Reid* court did not define what it meant by "adequate," nor have the parties provided authority to guide us. In the equity context, whether a legal remedy is adequate so as to preclude an equitable remedy is an intensely case-specific inquiry. 27A Am. Jur. 2d *Equity* § 70. The plaintiff has the burden of showing a lack of adequate remedy or the inadequacy of existing remedies at law. *See Id*.

According to Black's Law Dictionary, an "adequate remedy at law" is "[a] legal remedy that provides sufficient relief to the petitioning party, thus preventing the party from obtaining equitable relief. BLACK'S LAW DICTIONARY 1551 (12th ed. 2024).

The Washington Supreme Court has addressed the adequacy or inadequacy of legal remedies in terms of providing equitable relief. For example, "[c]ourts have generally found remedies to be inadequate in three circumstances: (1) the injury complained of by its nature cannot be compensated by money damages, (2) the damages cannot be ascertained with any degree of certainty, and (3) the remedy at law would not be efficient because the injury is of a continuing nature." *Kucera v. Dep't of Transp.*, 140 Wn.2d 200, 210, 995 P.2d 63 (2000). "A remedy is not inadequate merely because it is attended with delay, expense, annoyance, or even some hardship." *Riddle v. Elofson*, 193 Wn.2d 423, 434, 439 P.3d 647 (2019). "Something in the nature of the action must make it apparent that the rights of the litigants will not be protected or full redress will not be afforded." *Id*. "A court will grant equitable relief only when there is a showing that a party is entitled to a remedy and the remedy at law is inadequate." *Sorenson v. Pyeatt*, 158 Wn.2d 523,

17

531, 146 P.3d 1172 (2006). "Washington courts follow the general rule that equitable relief will not be accorded when there is a clear, adequate, and complete remedy at law." *Id.* at 543.

C.    Analysis

Henry argues that the existing cause of action under the WLAD is inadequate because a constitutional tort aside from that allowed by the WLAD would require the state's conduct survive strict scrutiny analysis.

Assuming without deciding that strict scrutiny applies here, Henry fails to demonstrate why the WLAD is inadequate. Indeed, requiring the state action to survive strict scrutiny may make Henry's case easier to prove, but while a more favorable standard may be desirable, it does not, alone, render the existing cause of action under the WLAD inadequate. Henry provides no other analysis, aside from the bare assertion that strict scrutiny applies, that shows how a cause of action for religious discrimination under the WLAD is inadequate.

Instead, Henry merely asserts that "the WLAD does not afford equivalent protection. Reply Br. at 37. Henry provides no analysis showing why greater protections under strict scrutiny make recognition of a constitutional tort for damages more appropriate than that available under the WLAD. Nor does Henry brief the inadequacy of the WLAD to address her claim. Henry also fails to present a reasoned and principled basis for recognizing a constitutional tort for damages. That Henry may benefit in some unspecified manner from strict scrutiny is insufficient to warrant the recognition of a constitutional tort for damages under the facts of this case. Henry has not met her burden under *Reid*. Therefore, we decline to recognize a standalone constitutional tort cause of action for damages in this case.

II.     THE TRIAL COURT ERRED WHEN IT DISMISSED HENRY'S CLAIM UNDER THE WLAD

Henry argues that the trial court erred when it dismissed at summary judgment her religious discrimination claim under the WLAD. She asserts her evidence meets the prima facie elements for a claim under the WLAD, and DFW did not satisfy its burden to show an undue hardship excusing accommodation, or provide a reasonable accommodation. DFW argues that Henry failed to establish a prima facie case, that Henry's job required in-person contact, the removal of which is not a valid reasonable accommodation, and Henry was provided a reasonable accommodation. We hold that the court's dismissal at summary judgment was erroneous.

A.      Underlying Legal Principles

The WLAD provides that "[t]he right to be free from discrimination because of race, creed,[15] color, national origin, citizenship or immigration status, sex, honorably discharged veteran or military status, sexual orientation, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability is recognized as and declared to be a civil right." RCW 49.60.030(1).

"[T]he WLAD's purpose is the 'elimination and prevention of discrimination,' and it contains a requirement that the WLAD be construed 'liberally for the accomplishment' of this purpose." *Suarez v. State*, 3 Wn.3d 404, 425, 552 P.3d 786 (2024) (quoting RCW 49.60.010, .020). A "hierarchy of protected classes . . . directly contradicts the central purpose of the WLAD, [which is] the elimination and prevention of discrimination on the basis of all protected classes." *Id.* at 428. Washington's adoption of federal statutes and case law in interpreting the WLAD is limited by "'those theories and rationale which best further the purposes and mandates of our

---

[15] "Creed" is religious belief. *Kumar v. Gate Gourmet Inc.*, 180 Wn.2d 481, 489, 325 P.3d 193 (2014); *see Suarez*, 552 P.3d at 414-16;

statute.'" *Id.* at 428 (*Kumar v. Gate Gourmet, Inc.*, 180 Wn.2d 481, 491, 325 P.3d 193 (2014)).

When the Washington Supreme Court "has departed from federal antidiscrimination laws, it has almost always ruled that the WLAD provides greater protections than its federal counterparts." *Id.* at 426.

B.      Henry's Prima Facie Case

Henry argues that she has a sincerely-held religious belief against getting vaccinated. DFW disputes this, arguing that "Henry failed to show that she had a religious belief that *conflicted* with the since-rescinded requirement that she receive the COVID-19 vaccination." Br. of Resp't at 15 (emphasis in original). We conclude that there is a genuine issue of material fact as to the sincerity of Henry's religious belief against vaccinations.

1.      Legal Principles

To bring a claim for religious discrimination for failure to accommodate under the WLAD, the complaining employee must show that:

> (1) They had a bona fide religious belief, the practice of which conflicted with employment duties;[16] (2) they informed the employer of the beliefs and conflict; and (3) the employer responded by subjecting the employee to threatened or actual discriminatory treatment.

*Suarez*, 3 Wn.3d at 418.

---

[16] There is no in-jurisdiction case law explaining what a "bona fide religious belief" is. Instead, the rule appears to merely require that an employee assert a plausible religious belief that conflicts with employment duties. This assumption is based on a lack of Washington precedent conducting any examination whatsoever of such an assertion. *See generally Suarez*, 3 Wn.3d 409, 41 (where the court accepts nurse's assertion that she is a nondenominational Christian with required religious observation days); *see generally State v. Arlene's Flowers, Inc.*, 193 Wn.2d 469, 484, 441 P.3d 1203 (2019) (where a flower shop owner asserted that furnishing custom floral arrangements for a same-sex wedding violates her religious beliefs about marriage); *see generally Kumar*, 180 Wn.2d 481 (where Gate Gourmet employees claimed that consuming the food provided to them violated their religious beliefs).

2. Analysis

Here, Henry attested in two declarations that her religious beliefs prohibited her from getting vaccinated, a requirement under the Governor's proclamations and DFW policy. While she stated in her deposition that, "I'm not being told that I am being prohibited from getting vaccinations" and "[t]here's nothing that says I'm prohibited," she also clearly stated her belief that she should put her faith and trust in the Lord for healing, rather than relying on vaccinations. CP at 238-39. She has refused vaccines in the past for shingles and tetanus. Construing the facts and reasonable inferences in the light most favorable to Henry, as we must, reasonable minds could conclude that she had a bona fide religious belief that conflicted with her employer's demand that she get the COVID-19 vaccine. Therefore, a genuine issue of material fact exists.[17]

C. DFW's Reasonable Accommodation Defense

DFW argues removing or changing essential functions of Henry's position is an undue hardship because in disability cases, which have a higher burden than religious exercise cases, DFW accommodating Henry by eliminating in-person contact from her position was not required as a matter of law. DFW also argues that it did offer Henry a reasonable accommodation—the budget analyst position. Henry argues that all categories of persons protected from discrimination by the WLAD are, or should be, treated equally, and that in-person contact was not an essential function of her job. RCW 49.60.180. Henry also argues that the budget analyst position was not a reasonable accommodation. We conclude that under the facts in the record whether in-person

---

[17] The parties rely on the following cases to support their arguments regarding whether Henry held a bona fide religious belief: *Burns v. S. Pac. Transp. Co.*, 589 F.2d 403 (9th Cir. 1978); *Anderson v. Gen. Dynamics Convair Aerospace Div.*, 589 F.2d 397 (9th Cir. 1978); *Thomas v. Rev. Bd. of Indiana Emp't Sec. Div.*, 450 U.S. 707, 101 S. Ct. 1425, 67 L. Ed. 2d 624 (1981); *Frazee v. Illinois Dep't of Emp't Sec.*, 489 U.S. 829, 109 S. Ct. 1514 103 L. Ed. 2d 914 (1989).

contact is an essential function and whether DFW offered Henry a reasonable accommodation are genuine issues of material fact.

### 1. Legal Principles

Under federal law, the accommodations requirements for those with disabilities are derived from the ADA. 42 U.S.C. §§ 12111(9), 12112; *Suarez*, 3 Wn.3d at 416. The requirements for those seeking religious-based accommodations are derived from Title VII of the Civil Rights Act. 42 U.S.C. §§ 2000e(j), 2000e-2; *Groff v. DeJoy*, 600 U.S. 447, 471-73, 143 S. Ct. 2279, 216 L. Ed. 2d 1041 (2023). Washington courts look to federal counterpart statutes and federal case law for guidance when interpreting provisions in the WLAD. *See Suarez*, 3 Wn.3d at 427-28. However, Washington courts depart from federal guidance when doing so furthers the purposes and mandates of the WLAD. *See Id.* at 428. Specifically, the Supreme Court has rejected a hierarchy of protected classes under the WLAD because doing so would contradict the purpose of the WLAD. *Id.*. Therefore, there is no distinction between protected classes in Washington with regard to reasonable accommodations.

An "employer [can] defend against a claim of failure to accommodate religious practices with an 'undue hardship' defense by showing that the reasonable accommodation would not be possible without 'undue hardship on the conduct of the employer's business.'" *Id.* at 418 (internal quotation marks omitted) (quoting *Kumar*, 180 Wn.2d at 497); 42 U.S.C. § 2000e(j)). "Court[s] considering an 'undue hardship' defense in response to a failure to reasonably accommodate an employee's religious practices under the WLAD must apply the substantial burdens test." *Id.* at 425; *DeJoy*, 600 U.S. at 468-69. Under the substantial burdens test, "hardship" means, at minimum, "'something hard to bear.'" *Suarez*, 3 Wn.3d at 426 (internal quotation marks omitted) (quoting *DeJoy*, 600 U.S. at 468-469). "'Undue' means that the requisite burden, privation, or

adversity must rise to an excessive or unjustifiable level." *Suarez*, 3 Wn.3d at 426 (internal quotation marks omitted) (quoting *Groff*, 600 U.S. at 468-469).

A court must consider "whether the defendant employer has sufficiently shown that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Suarez*, 3 Wn.3d at 426; *Groff*, 600 U.S. at 469; *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 83 n.14, 97 S. Ct. 2264, 53 L. Ed. 2d 113 (1977). "The court should look at all relevant factors in the case at hand, 'including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of [an] employer.'" *Suarez*, 3 Wn.3d at 426 (internal quotation marks omitted) (alteration in original) (quoting *Groff*, 600 U.S. at 470-71). "It would not be enough to simply conclude that a suggested accommodation would cause an undue hardship, an employer would have to consider other possible options." *Suarez*, 3 Wn.3d at 426-27; *Groff*, 600 U.S. at 473. "[T]he analysis of an 'undue hardship' defense is not simply a financial or monetary loss calculation. *Suarez*, 3 Wn.3d at 427. "Courts should resolve whether a hardship would be substantial in the context of an employer's business in the commonsense manner that it would use in applying any such test." *Id.*; *Groff*, 600 U.S. at 471.

"Generally, whether an employer made reasonable accommodation or whether the employee's request placed an undue burden on the employer are questions of fact for the jury." *Pulcino v. Fed. Express Corp.*, 141 Wn.2d 629, 644, 9 P.3d 787 (2000), *overruled on other grounds by McClarty v. Totem Elec.*, 157 Wn.2d 214, 137 P.3d 844 (2006).

In *Suarez*, our Supreme Court recognized the following "undue hardships" under the substantial burdens test: (1) Accommodations that require violation of a government mandate or law; (2) Accommodations that create unreasonable safety risks, regardless of economic costs; (3)

Accommodations that create an undue hardship on coworkers and therefore also an employer; (4) Accommodations that require preferential treatment on the basis of religion to the detriment of other protected classes. 3 Wn.3d at 426-27.

2. Essential Functions[18] of Henry's Position

Under *Suarez*, a bare assertion that in-person contact is an essential function is insufficient to establish that accommodating Henry as Spoon suggested would result in substantial increased costs so as to satisfy the substantial burdens test and arise to the level of an undue hardship. We conclude that there remains a genuine issue of material fact as to whether accommodating Henry in her Bio 2 position constituted an undue hardship.

*Davis v. Microsoft Corp.*, 149 Wn.2d 521, 70 P.3d 126 (2003), is instructive for defining essential functions. Our Supreme Court wrote in relevant part that "an 'essential function' is a job duty that is fundamental, basic, necessary, and indispensable to filling a particular position, as opposed to a marginal duty divorced from the essence or substance of the job." *Id.* at 533. The court continued "[a]dditionally, job duties are aptly defined as 'obligatory tasks, conduct, service, or functions enjoined by order or usage according to rank, occupation, or profession.'" *Id.* at 534 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 705 ( ("duty" n.2a)). "The term 'functions' (or 'job duties') cannot be construed simply as 'tasks'; rather, the term 'essential functions' must refer not only to the tasks and activities that are indispensable to the job, but also to the 'conduct' and 'service' required of the employee. *Id.* at 533-34.

The *Davis* court went on to discuss in great detail why the particular function at issue was essential—clearly made possible by the presence of facts in the record. *Id.* This suggests more than a bare assertion by the employer that the function was essential. Indeed, "the fact finder's

---

[18] We use the terms "essential functions" and "essential duties" interchangeably.

role includes determining whether functions that the employer claims are essential are ones that the employer *in fact* treats as essential." *Fey v. State*, 174 Wn. App. 435, 451, 300 P.3d 435 (2013) (emphasis in original).

Here, we have a bare assertion because Carlson described merely that in-person contact was part of her vision for the job. This is not enough to establish for summary judgment purposes that in-person contact is an essential function. Rather, there remains an issue of material fact as to whether in-person contact is an essential function so summary judgment is improper.

In its argument, DFW cites to *Pulcino*, 141 Wn.2d at 644, for the proposition that eliminating or reassigning an essential job function is an undue hardship per se. But *Pulcino* does not compel a different result.

Even if reassigning an essential job function is an undue hardship per se, it remains that whether in-person contact is an essential job function of the Bio 2 position is a genuine issue of material fact. DFW's Bio 2 role required support and relief of the workload of Bio 3s, potentially with many overlapping duties. Spoon (a former Bio 3, now a Bio 3 supervisor) told her colleagues that she could shift job duties from Bio 3s "that require zero human contact" to Henry, and that doing so "would take workload off of Bio 3s"—an apparent *benefit*. CP at 194. Henry attested that Spoon said those tasks were within her Bio 2 job description. Spoon also opined that doing so would be less burdensome on Bio 3s than terminating Henry and having to hire someone to fill her position.

When viewed in the light most favorable to Henry, the evidence in the record before us creates a genuine issue of material fact as to whether Henry's Bio 2 position essentially required in-person contact. Therefore, summary judgment is improper.

3.      Henry's New Role in Budgeting

DFW argues that an accommodation in budgeting was offered and accepted prior to Henry leaving her Bio 2 position. Henry disputes that this accommodation was reasonable. Henry argues that DFW had several available means of accommodating her in her Bio 2 position, including implementing Spoon's suggested accommodation, letting her continue to work from home, requiring those present at outdoor meetings with her to wear masks and socially distance, and requiring her to periodically test for COVID-19, but it chose not to do so. The burden of establishing the reasonable accommodation defense rests with DFW.

First, without knowing whether in-person contact was an essential function of the Bio 2 position, we are unable to determine which duties are essential and therefore whether reassignment of duties as proposed by Spoon would have been a reasonable accommodation. Certainly, DFW's budget analysis position, with a lower pay rate, less than full-time work, and temporary rather than full-time status gives rise to a question of fact as to whether that position was a reasonable accommodation. And at the very least, Henry was out of work for 18 days as a result of DFW's decision not to accommodate her in her Bio 2 position. Because a reasonable trier of fact could conclude that DFW's budgeting accommodation was unreasonable, an issue of material fact exists and summary judgment is not proper.

DFW, citing *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 107 S. Ct. 367, 93 L. Ed. 2d 305 (1986), and *Dedman v. Wash. Pers. Appeals Bd.*, 98 Wn. App. 471, 485, 989 P.2d 1214 (1999), argues that Henry was offered and she accepted a reasonable accommodation, thus ending the inquiry because any reasonable accommodation is sufficient to meet the accommodation obligation under the WLAD. Henry's case is distinguishable from both *Philbrook* and *Dedman*.

In *Philbrook*, a high school teacher requested and was denied two different time-off alternatives to accommodate religious observance days beyond those already granted. 479 U.S. at 65. The Court there articulated the rule that "where the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end. The employer need not further show that each of the employee's alternative accommodations would result in undue hardship." *Id.* at 68 The court held that incentivizing an employee "to hold out for the most beneficial accommodation, despite the fact that an employer offers a reasonable resolution," is in conflict with the statute. *Id.* at 69.

However, the question in *Philbrook* was whether the Court of Appeals "erred by requiring the Board to nonetheless demonstrate the hardship of Philbrook's alternatives" after the Court of Appeals assumed that the already granted leave days constituted a reasonable accommodation. *Id.* at 68-69. The court there held "that an employer has met its obligation under [Title VII] when it demonstrates that it has offered a reasonable accommodation to the employee. *Id.* at 69. Because we cannot know which duties are essential, we cannot make a similar assumption of reasonableness as the *Philbrook* court did. And Henry was offered the budget analyst position: a temporary, part-time position at a lower wage. There remains a genuine issue of material fact as to whether this accommodation was reasonable, which precludes summary judgment.

In *Dedman*, a Department of Corrections (DOC) officer had medical disabilities that prevented her from safely physically restraining inmates, an essential function of her former position. 98 Wn. App. at 482-83. DOC accommodated her by giving her a light duty clerical role; however, she preferred her former position and sought to be reinstated there. *Id.* at 472-76. The court determined that "the DOC was not required to accommodate Dedman in order to permit her to remain in a correctional officer position where her disabilities rendered her unable to perform

59241-0-II

an essential function of the job." *Id.* at 484. The court further determined that "because Dedman's disabilities prevented her from performing an essential job function, which no reasonable accommodation would enable her to perform, the DOC lawfully reassigned her from a correctional officer position to a clerical position." *Id.* at 486. The court in *Dedman* held that an employer is not required to choose the employee's preferred accommodation; rather, the employer must offer a *reasonable* accommodation. *See Id.* at 485. *Dedman*, too, is beside the point because the question there turns on essential functions of the job. In Henry's case, that remains a genuine issue of material fact.

The inquiry here is not ended because Henry took another job. Construing the facts and inferences in favor of Henry, the evidence in the record in this case creates a genuine issue of material fact as to the reasonableness of the budget analyst position as an accommodation. Summary judgment is therefore improper

CONCLUSION

We affirm the trial court's dismissal of Henry's claim under article I, section 11 of the Washington Constitution and reverse and remand for further proceedings consistent with this opinion regarding Henry's religious discrimination claim under the WLAD.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Veljacic, A.C.J.

I concur:

_____
Che, J.

28

PRICE, J. (dissenting) — I agree with most of the court's opinion, including that Henry cannot make a stand-alone claim for damages under article I, section 11 of the Washington Constitution. I disagree, however, with the court's conclusion that Henry's Washington Law Against Discrimination (WLAD), ch. 49.60 RCW, claim survives summary judgment.

The court today holds that Henry has successfully made a prima facie case for her WLAD claim and that because of genuine issues of material fact on all elements, summary judgment in favor of the Department of Fish & Wildlife (DFW) was error. I write separately to make two points.

First, the court holds that there is a genuine issue of material fact on whether Henry has a bona fide religious belief that conflicted with the COVID-19 vaccine mandate. I am not so sure Henry has done enough to create an issue of fact on this question. As recited by the court, Henry was asked a question about "what in [her] faith says that [she] is prohibited from receiving vaccinations," and she responded with, "I'm not being told [that] I am being prohibited from getting vaccinations." Clerk's Papers (CP) at 238. As more COVID-19 vaccine and religious objections cases are being decided, the case law is developing. And under prevailing case law, Henry's admission that she is "not being told that [she is] being prohibited from getting vaccinations" could be seen as defeating her claim—essentially showing that her objection to the COVID-19 vaccine is a personal belief cloaked in religion as opposed to a bona fide religious belief. *See, e.g., Petermann v. Aspirus, Inc.*, 2023 WL 2662899 (W.D. Wis. March 28, 2023) (for religious objection cases, "[t]he important question isn't whether an employee has a religious belief not to mistreat [their] body; the question is whether the employee's belief that the vaccine qualifies as mistreatment is itself based in religion"); *Detwiler v. Mid-Columbia Med. Center*, 2023 WL 7221458 (D. Or. Sept. 13, 2023) (where plaintiff believed her "body is a temple of the Holy

29

Spirit" and "sincerely believe[d] she [had] a religious duty to avoid defiling her temple," the court observed that "virtually every court examining the precise belief invoked by plaintiff has held that Title VII's protections do not apply"). But I do not fault the court for failing to address these cases because DFW failed to present them. *See Dalton M, LLC v. N. Cascade Tr. Servs., Inc.*, 2 Wn.3d 36, 50, 534 P.3d 339 (2023) (explaining that Washington courts generally follow the rule of party presentation). Thus, this issue is not the root of my dissent from the court's opinion.

Rather, my dissent is based on what I believe to be a misstep when the court holds that there is a genuine issue of material fact about whether in-person contact is an essential function of a Habitat Biologist 2 position. This is a key holding from the court because if in-person contact is an essential function, then DFW cannot be required to find an accommodation around it. *See Pulcino v. Fed. Express Corp*., 141 Wn.2d 629, 644, 9 P.3d 787 (2000), *overruled on other grounds in McClarty v. Totem Elec*., 157 Wn.2d 214, 137 P.3d 844 (2006) (an employer's duty to reasonably accommodate does not require the employer "to alter the fundamental nature of the job, or eliminate or reassign essential job functions").

The court characterizes DFW's claim that in-person contact is an essential function as "a bare assertion." Majority at 25. I see the facts differently.

In her declaration, Habitat Program Director Margen Carlson concluded that in-person contact is an essential function of a Biologist 2. She stated:

> I reviewed Ms. Henry's job description, as well as received input from others within the Habitat Program and Ms. Henry. I determined that Ms. Henry was unable to perform all the essential functions of her Biologist 2 position based on the risk associated with her unvaccinated status. Specifically, I determined that the essential functions of Ms. Henry's Biologist 2 position included requirements that she be in the physical presence of others, both the public and other DFW employees.

CP at 209.

But Ms. Carlson did more than just assert this conclusion, she attached, as support, a six-page job description for the Biologist 2 position. This job description expressly includes several references to duties that would reasonably seem to require in-person contact, as illustrated by the following excerpts:

**Position Objective**

. . . .

- Forest Practice Review, Organization, Sort and Distribute; Assistance with Comments. . . . Under guidance from the Bio 3s, the Bio 2 will help screen Forest Practices Applications for potential impacts to fish life and habitat, PHS, and PR and *will work with local [Department of Natural Resources] foresters and landowners to avoid, minimize, and mitigate these impacts*.

CP at 211-12 (emphasis added).

**Assigned Work Activities (Duties and Tasks)**

. . . .

30% **Duty**: Assist with the responsibility of assigned SEPA/NEPA documents and development applications to review for variance requests . . . . *Provide technical assistance to local governments and other state and federal agencies . . . .*

**Tasks include**:

- *Working with city and county planners, citizens, developers, and conservation groups . . . .*

CP at 212 (emphasis added).

**Working Conditions**

. . . .

Customer Interactions: *Position will frequently communicate with landowners, must possess effective negotiation skills with clients, local government officials, agriculture, forest and special interest groups.*

CP at 213-14 (emphasis added).

**Qualifications**

. . . .

**Facilitation and negotiation skills** – . . . Being tactful and sensitive when dealing with people with strongly held opposing viewpoints and when addressing "politically sensitive" matters are very important qualities for this position. Exemplary social and verbal communication skills are needed . . . .

. . . .

**Appearance and Attire** – . . . A professional appearance including grooming and attire is expected when working with local, state, and federal agencies, tribes, permit applicants and the public.

CP at 214. Even if these excerpts do not necessarily reference in-person versus other types of contact with individuals, they present a picture of a highly interactive position and lend strong objective support to Ms. Carlson's declaration, taking DFW's position, in my view, well beyond a bare assertion.

Moreover, even the Spoon e-mail, provided by Henry and cited by the court as support for today's holding, provides corroboration to DFW's assertion that in-person contact is essential to the Biologist 2 position—Spoon suggested that duties could be transferred away from Henry's Biologist 2 role so that she could avoid in-person contact. One might ask why these duties requiring in-person contact would need to be transferred if they were not a pre-existing part of the position.

Today's holding is wrapped in the language of an evidentiary burden—that is, DFW has not done enough to show in-person contact is essential when viewing the facts in a light most favorable to Henry. But our Supreme Court has clearly directed that employers are entitled to

define the essential functions of their own positions. *See Davis v. Microsoft Corp.*, 149 Wn.2d 521, 534, 70 P.3d 126 (2003). Although today's opinion discusses *Davis v. Microsoft*, the court's takeaway from the case appears to be that employers need to create an extensive factual record to justify designating a function as "essential." The lesson I draw from *Davis* is that the WLAD requires that employers be given latitude to define their own employees' positions. *See id.* at 536 ("In effect, what Davis asks this court to do is redefine for Microsoft its systems engineer position; but just as the WLAD does not authorize Davis or this court to tell Microsoft how to set its selling objectives and customer service goals, the WLAD does not permit Davis or this court to tell Microsoft how to organize its work force and structure individual jobs to meet those targets."); *see also Fey v. State*, 174 Wn. App. 435, 451-52, 300 P.3d 435 (2013) ("If the employer's identification of its allocation of functions is borne out by its conduct, the fact finder's role does not extend to substituting its own judgment for how the employer should allocate essential work among employment positions in the workplace."), *review denied*, 179 Wn.2d 1029 (2014).

Even construing the facts in a light most favorable to Henry, she challenges DFW's position that in-person contact is essential to the Biologist 2 position with very little; she suggests that masks could be worn or duties shifted. I would hold that in the face of a clear, and supported, declaration from DFW that in-person contact is an essential function, Henry has failed to create a genuine issue of material fact on that question. And if in-person contact is required as an essential function of being a Biologist 2, DFW cannot be forced to change the position for Henry. *Id.* at 452 ("Washington law is well settled that to prove a claim for failure to accommodate, a plaintiff must demonstrate that he or she can perform the essential functions of the job as determined and applied by the employer—not that the employer could revamp the essential functions of a job to fit the employee.").

Respectfully, I dissent.

_____
  PRICE, J.